## RUGENDORF v. UNITED STATES.

No. 223.   Argued February 27, 1964.—Decided March 30, 1964.

*Julius Lucius Echeles* argued the cause for petitioner. With him on the briefs were *Melvin B. Lewis* and *Howard W. Minn.*

*David C. Acheson* argued the cause for the United States. With him on the brief were *Solicitor General Cox, Assistant Attorney General Miller, Frank Goodman* and *Philip R. Monahan.*

MR. JUSTICE CLARK delivered the opinion of the Court.

Following a trial by jury, petitioner was convicted of violating 18 U. S. C. § 2315 [1] by knowingly receiving, concealing and storing 81 stolen fur pieces, the fur pieces having been transported in interstate commerce and having a value exceeding $5,000. The Court of Appeals sustained the conviction despite petitioner's objections that the evidence was not sufficient to support the verdict; that the fur garments should have been excluded from evidence because they were seized on the authority of a search warrant supported by a deficient affidavit; and that the names of certain confidential informants referred to in the affidavit should have been disclosed. 316 F. 2d 589. We granted certiorari, 375 U. S. 812, and affirm the judgment.

## I.

The search warrant under attack was issued by the United States Commissioner on the strength of an affidavit dated March 22, 1962, and signed by Marlin Moore, a Special Agent of the Federal Bureau of Investigation. The affidavit stated that Moore had reason to believe that approximately 80 fur stoles and jackets, taken in a burglary in Mountain Brook, Alabama, and worth about $40,000, were concealed in the basement of a single family residence at 3117 West Jarvis Avenue in Chicago.

---

[1] 18 U. S. C. § 2315:

"Whoever receives, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise, securities, or money of the value of $5,000 or more, or pledges or accepts as security for a loan any goods, wares, or merchandise, or securities, of the value of $500 or more, moving as, or which are a part of, or which constitute interstate or foreign commerce, knowing the same to have been stolen, unlawfully converted, or taken; . . .

.          .          .          .

"Shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

Moore supported this allegation with statements that L. Dean Paarmann, a Special Agent of the Birmingham, Alabama, Office of the FBI, informed Moore that on February 10, 1962, 82 mink, otter, and beaver stoles and jackets (but no full-length coats), worth approximately $42,044, were stolen in Mountain Brook, Alabama, and that on March 16, 1962, a confidential informant who had furnished reliable information in the past told Moore that during the previous week he saw approximately 75 to 80 mink, otter and beaver stoles and jackets (but no full-length coats) in the basement of the home of Samuel Rugendorf at 3117 West Jarvis Avenue, Chicago. The labels had been removed and the informant was told that the furs were stolen.

Moore further supported the allegation with the following statements: FBI Special Agent McCormick advised affiant that a confidential informant whom the FBI had found to be reliable told McCormick that Frank Schweihs of Chicago, and others, committed the Alabama robbery; McCormick told the affiant that on or about March 1, 1962, James Kelleher, a Chicago police officer, said to McCormick "that he saw FRANK SCHWEIHS at RUGGENDORF [sic] BROTHERS MEAT MARKET, managed by SAMUEL RUGGEN-DORF [sic] . . . ; further, Agent McCORMICK advised this affiant that another confidential informant who has furnished reliable information to the Federal Bureau of Investigation in the past told McCORMICK that LEO RUGGENDORF [sic] was a fence for FRANK SCHWEIHS; that SAMUEL RUGGENDORF [sic] was LEO RUGGENDORF'S [sic] brother and was associated in the meat business with his brother."

The affidavit also stated that another FBI Special Agent, J. J. Oitzinger, told the affiant that another confidential informant who had supplied the FBI with reliable information in the past advised Oitzinger that Frank

Schweihs, Tony Panzica and Mike Condic were accomplished burglars who disposed of the proceeds of their burglaries through Leo Rugendorf.

Finally, the affidavit alleged that, upon checking the informant's description of the furs seen at 3117 West Jarvis Avenue, affiant found that the only reported burglary in the United States in the previous six months involving furs of that description and value was the one occurring at Mountain Brook, Alabama.

Pursuant to the search warrant based on this affidavit, a search was made and 81 furs were found in the basement of petitioner's residence. Fifty-nine of these furs had been stolen in Mountain Brook and the other 22, in Shreveport, Louisiana. Prior to trial, the trial court heard testimony on petitioner's motion, under Rule 41 (e) of the Federal Rules of Criminal Procedure,[2] to suppress the use of the seized furs as evidence. The trial court denied the motion insofar as it challenged the legal sufficiency of the affidavit, but reserved ruling on the truthfulness of the affidavit. During the trial, another hearing was held on the reserved aspect of the motion to suppress and the motion was denied. Also denied was a motion to require the Government to disclose the names of the confidential informants referred to in the affidavit.

## II.

Petitioner attacks the validity of the search warrant. This Court has never passed directly on the extent to

---

[2] Rule 41 (e) of the Federal Rules of Criminal Procedure:

*"Motion for Return of Property and to Suppress Evidence.* A person aggrieved by an unlawful search and seizure may move the district court for the district in which the property was seized for the return of the property and to suppress for the use as evidence anything so obtained on the ground that . . . (4) there was not probable cause for believing the existence of the grounds on which the warrant was issued . . . ."

which a court may permit such examination when the search warrant is valid on its face and when the allegations of the underlying affidavit establish "probable cause"; however, assuming, for the purpose of this decision, that such attack may be made, we are of the opinion that the search warrant here is valid. Petitioner contends that probable cause did not exist because the only relevant recitations in the affidavit were the one informant's statements that he saw the furs in petitioner's basement and that he was told that they were stolen. However, the informant's detailed description of the furs, including number and type, closely resembled Special Agent Paarmann's description of the furs stolen in Alabama. The affiant checked the burglary report records and found the Alabama burglary to be the only recent one in the United States involving furs of the description and number that the informant saw in petitioner's basement. In addition, the affidavit alleged that Leo and Samuel Rugendorf were brothers and that Leo was a fence for professional burglars. Although one of the informants who gave the latter information added, incorrectly, that Samuel Rugendorf was associated with Leo in the meat business,[3] there was direct information from another informant of the FBI that Leo was a fence, and nothing was shown to prove this untrue. The factual inaccuracies depended upon by petitioner to destroy probable cause—i. e., the allegations in the affidavit that petitioner was the manager of Rugendorf Brothers Meat Market and that he was associated with his brother Leo in the meat business—were of only peripheral relevancy to the showing of probable cause, and, not being within the personal knowledge of the affiant, did not go to the integrity of the affidavit.

---

[3] In fact, petitioner terminated his business association with his brother Leo and with Rugendorf Brothers Meat Market in 1952.

We believe that there was substantial basis for the Commissioner to conclude that stolen furs were probably in the petitioner's basement. No more is required. As we said in *Jones* v. *United States,* 362 U. S. 257, 271 (1960):

> "We conclude .. . . that hearsay may be the basis for a warrant. We cannot say that there was so little basis for accepting the hearsay . . . that the Commissioner acted improperly. . . . He might have found the affidavit insufficient and withheld his warrant. But there was substantial basis for him to conclude that narcotics were probably present in the apartment, and that is sufficient."

Petitioner also contends that the withholding of the identities of the informants was a sufficient ground to require suppression of the evidence. But in *Jones, supra,* we said that "as hearsay alone does not render an affidavit insufficient, the Commissioner need not have required the informants . . . to be produced . . . so long as there was a substantial basis for crediting the hearsay." At 272. Petitioner's only challenges to the veracity of the affidavit are the two inaccurate facts mentioned above. Since the erroneous statements that petitioner was the manager of Rugendorf Brothers Meat Market and was associated with Leo in the meat business were not those of the affiant,[4] they fail to show that the affiant was in bad faith or that he made any misrepresentations to the Commissioner in securing the warrant.

---

[4] The affidavit alleged that McCormick told the affiant that Police Officer Kelleher told him that petitioner was the manager of Rugendorf Brothers Meat Market and that a confidential informant told McCormick that Leo and petitioner were associated in the meat business. Kelleher testified that he did not so inform McCormick. The latter was in the hospital for an operation at the time of trial, but his deposition was not sought nor any postponement requested to enable him to be present.

## III.

Petitioner also asserts that he was entitled to the name of the informer who reported seeing the furs in his basement in order to defend himself at trial on the merits. This claim was not properly raised in the trial court nor passed upon there, and, accordingly, must be denied here. On two occasions—once prior to and the other during the trial—petitioner urged his motion to suppress the evidence as to the furs, contending that there were "factual errors" in the affidavit supporting the search warrant. It was solely in support of this motion—not on the merits—that petitioner requested all of the informants' names. This is made clear by petitioner's motion for new trial:

"9. The court erred in overruling the defendant's motion for the government to reveal the names of the informers when such information was necessary to the constitutional rights of the defendant *in pursuing his motion to suppress the evidence.*" (Emphasis added.)

He relied entirely on suppression, which, if successful, would have ended the case. Failing in this, petitioner asserted, for the first time, in his reply brief in the Court of Appeals that the name of the single informant who saw the furs was vital both for the suppression hearing and for the defense at trial, because the informant alone knew whether he "participated with persons other than the defendant" in placing the furs in the basement. Apparently this was an attempt to bring the facts of the case within *Roviaro* v. *United States,* 353 U. S. 53 (1957), where the informant had played a direct and prominent part, as the sole participant with the accused, in the very offense for which the latter was convicted. But there was not even an intimation of such a situation at the trial here. The necessity for disclosure depends upon "the particular circumstances of each case, taking into consid-

eration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." 353 U. S. 53, 62. Petitioner did not develop any such criteria with reference to the merits of the case. On the contrary, a careful examination of the whole record shows that he requested the informers' names only in his attack on the affidavit supporting the search warrant. Having failed to develop the criteria of *Roviaro* necessitating disclosure on the merits, we cannot say on this record that the name of the informant was necessary to his defense. All petitioner's demands for identification of the informants were made during the hearings on the motion to suppress and were related to that motion.[5] Never did petitioner's counsel indicate how the informants' testimony could help establish petitioner's innocence.

Nor do we believe that the trial court erred in refusing to have the Government disclose the exact date during the week preceding March 16 when the informant saw the

---

[5] It was during the hearing on the motion prior to trial that petitioner cited *United States* v. *Pearce,* 275 F. 2d 318; *Giordenello* v. *United States,* 357 U. S. 480; and *Roviaro* v. *United States,* 353 U. S. 53. His counsel said: "That is, Giordinella [*sic*] states that the defendant has a right to have such hearing [on suppression]. Pierce [*sic*] and Roviera [*sic*] state we have a right in advance of the hearing to demand the names of the informers if the names are essential to the defense of the defendant *in the prosecution of his petition to suppress the evidence.*" (Emphasis supplied.) And on the second hearing when the Government offered the furs in evidence he again urged his motion, in the absence of the jury, introducing evidence showing the "factual errors" in the affidavit. On arguing the motion, petitioner's. counsel said: "Here is what Pierce [*sic*] says, and here is what United States v. Roviera [*sic*] says: 'When it is demonstrated to the Court that it is essential to the defendant's rights, constitutional rights, that information be given to him so that he can test the validity of the affidavit,' then it must be given to him." Clearly his reliance on *Roviaro* for suppression purposes, which was the sole reason for which it was cited, was entirely misplaced.

furs in the petitioner's basement. It is difficult to see how that date could be useful to petitioner's defense, since the crucial date in the indictment was March 22 and there is no indication that the informant had any knowledge of any events occurring on that date. Petitioner's theory is that if he can find out the date, he may be able to show that he and his wife were away from home at the time when the informant saw the furs, thereby creating an inference that someone else let the informant in and that petitioner did not know of the furs. However, the particular date could not have been of material help to petitioner, as both he and his wife were away from home a major portion of nearly every day during the period in question.

### IV.

As to the sufficiency of the evidence, it was undisputed that 81 stolen furs were found in the basement of petitioner's home. The furs were hanging in a closet along with a fur piece admittedly owned by Mrs. Rugendorf. Petitioner's defense was that the furs were placed in the closet without his knowledge while he and his wife were vacationing in Florida and that neither he nor his wife looked into the closet after their return until the officers executed the search warrant on March 22. Petitioner's brother Leo, petitioner's sister, his son and a neighbor all had keys to his house. Both petitioner and his wife pointed to Leo as the guilty party, but neither Leo nor the other relatives who had keys were called as witnesses. The neighbor, who was called to testify, denied putting the furs in the basement or permitting any other person to use the key.

As early as 1896 this Court dealt with such situations. In *Wilson* v. *United States,* 162 U. S. 613, Chief Justice Fuller held for a unanimous Court that "[p]ossession of the fruits of crime, recently after its commission, justifies the inference that the possession is guilty possession, and,

though only *prima facie* evidence of guilt, may be of controlling weight unless explained by the circumstances or accounted for in some way consistent with innocence." At 619. Here, it was stipulated that 59 of the furs found in the petitioner's basement were stolen from a fur store in Mountain Brook, Alabama, on February 10, 1962. They were found in a closet opening off a regularly used recreation room. In the same closet was Mrs. Rugendorf's fur piece. Leo Rugendorf, petitioner's brother, was a known receiver of stolen goods and was seen at the home while the Rugendorfs were in Florida. Petitioner testified at trial that Leo had borrowed a key before petitioner went to Florida, and that Leo had not yet returned it. In rebuttal an FBI agent testified that petitioner told him that Leo returned the key soon after the petitioner returned from Florida. In some other respects the testimony of both petitioner and his wife conflicted with the rebuttal testimony of the FBI agents. Apparently the jury simply did not believe the explanation of petitioner and his wife. It may be that the jury's credulity was stretched too far; or, perhaps the failure of the defense to call Leo Rugendorf and the other kinsmen, to whom they had given keys to the home, appeared strange, especially so, since the neighbor was called to testify about his use of a key. In any event a prima facie case was made out by the stipulation and the presence of the furs in petitioner's home. We cannot say that this was insufficient.

*Affirmed.*

MR. JUSTICE DOUGLAS, with whom THE CHIEF JUSTICE, MR. JUSTICE BRENNAN and MR. JUSTICE GOLDBERG concur, dissenting.

Just prior to the presentation by the prosecution of its first witness at the trial, counsel for petitioner re-

quested the name or names of the informers mentioned in the search warrant:

"Mr. Echeles: *Roviaro* v. *United States* [353 U. S. 53], which is cited by our Seventh Circuit as authority for this proposition, states that if the informants, if the names of the informants are necessary to a proper defense or a proper presentation of the defendant's case in attacking the search warrant, then in the interest of justice it must be given to the defendant. The Government has no reason not to give it, said *Roviaro,* and that is the controlling law.

"Let me demonstrate how in our opinion the names of the informants are necessary."

Counsel then went on to argue why disclosure of one informant's name was essential to his motion to suppress. Then he shifted to another attack stating:

*"I would suggest that not only is this informant necessary to the defendant because if he takes the stand it will demonstrate that Sam Rugendorf had nothing to do with it,* or possibly his falsity, but I would suggest that perhaps he would be a pretty good witness for the Government, that they ought not to want to hide the witness, that he would pretty much make out a case for the Government. [Italics added.]

"In any event, your Honor, I rely upon United States v. Pearce, 275 F. 2d, our Circuit. I rely upon Roviaro v. United States, 353 U. S. 53. And I rely upon Giordenello v. United States, 357 U. S. 480, as being the proper procedure that I am trying to get here, your Honor."

It is impossible to say that this motion related wholly to quash the search warrant. It is true that *Pearce* and *Giordenello* involved such motions. But *Roviaro* did not.

Rather it presented the same issue this case presents, *viz.*, whether the "informer's privilege," 353 U. S., at 59, must give way in the interests of the defense of the accused.

The prosecutor objected, saying "that if the Government is to reveal the name of any informants they might be and probably would be killed."

The trial judge denied the motion and the trial started. During the trial the request was repeated, counsel for petitioner saying "I need that information to defend my defendant, your Honor." Whatever defect, if any, may have been present in his first motion did not appear this time. For now he was plainly addressing himself to the trial on the merits. Once again his request was denied.

It is obvious that these requests were made not only to challenge the sufficiency of the affidavit as a basis of the search warrant, but also for use on the issue of guilt or innocence—*viz.*, knowing possession of stolen goods. The issue was considered by the Court of Appeals,* 316 F. 2d 589, 592; and we should do the same.

Petitioner and his wife were in Florida on vacation between February 17 and March 4, 1962. Before they

---

*The majority states that the demand for disclosure as it related to a defense on the merits "was not properly raised in the trial court nor passed upon there, and, accordingly, must be denied here." *Ante*, at 534. But the trial excerpts reproduced above amply rebut that contention as it relates to the trial. And the Court of Appeals expressly said:

"The remaining point raised by defendant as error is the refusal of the trial court to require the disclosure of the name of the informer. The defendant relies on Roviaro v. United States, 353 U. S. 53." 316 F. 2d 589, 592.

As already noted, *Roviaro* did not involve a challenge to the sufficiency of a search warrant. It presented the issue this case does. One requesting disclosure and citing *Roviaro* as authority obviously is seeking to bring himself within the situation to which the *Roviaro* rule is applicable.

left Chicago petitioner's brother Leo—an admitted "fence" for stolen goods—came to his house to see him:

"Leo asked who was going to look after the mail, clean the sidewalks and everything else and he told Leo that his son Jerry would do it. Leo said that Jerry had to open the store every morning and stated that he got down a little later every day and so why not let him watch the house and bring in the mail. Accordingly, he gave his brother the keys.

"From that day, on February 17, 1962, until this day [the time of the trial] he had not seen or talked to his brother Leo; nor had Leo returned the key."

Leo, the brother, had one key to the house during petitioner's absence. His sister, his son, and a neighbor also had keys. Since one of these was a known criminal, and since the informant had personally been in the basement of petitioner's home, the pertinency of the inquiry as to the informant's name becomes obvious.

Speaking of the "informer's privilege," we said in *Roviaro* v. *United States,* 353 U. S. 53, 59: "The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation."

But there are times when the privilege must give way. In *Roviaro,* we put one of those exceptions in these words: "Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way. In these situations the trial court may require disclosure and, if the Government withholds the information, dismiss the action." *Id.,* at 60–61.

It is difficult to imagine a clearer case than the present one for application of that exception.

The Solicitor General seeks to avoid that conclusion by saying that even though the informant might disclose who stole the furs and how they reached the defendant's basement, "this would not necessarily have cast light upon the issue of petitioner's knowledge." The Solicitor General also argues that it is highly conjectural that identification of the person who admitted the informant to the basement would materially illuminate the question of petitioner's knowledge. We have, however, a case where the only proof implicating defendant was discovery of the stolen furs in his basement. Four keys to the house were in the hands of outsiders, one of whom had a criminal record for trafficking in stolen goods; the stolen furs may have reached defendant's basement during his absence and remained there without his knowledge. His only defense would be proof that someone without his knowledge put them there. Who that person was, when he placed the furs in the basement, what his motivations were in placing the furs there, what his relations with the defendant were, what connections he had with the stolen articles—these questions go to the very heart of the defense. *Roviaro* would, therefore, require in the exercise of sound discretion disclosure of the informant. Unless we allow that amount of leeway, we can only rest uneasy in the thought that we are helping send an innocent man to prison.

The Court does not face up to this crucial issue because, with due respect, it takes a Baron Parke approach when examining the record, the motions made, and the exceptions taken; and it concludes that the proper talismanic words were not used when the request for the informant's name was made. But that attitude belongs to an ancient regime, not to the one we administer under Rule 52 (b) of the Federal Rules of Criminal Procedure (see *Silber* v.

*United States,* 370 U. S. 717), which provides: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Our Rule 40 (1)(d)(2) is to the same effect. Enough has been said to show that the issue was squarely raised in the trial court and squarely passed upon by the Court of Appeals. But if it is assumed *arguendo* that the point was not squarely raised, few clearer cases for applying Rule 52 (b) have appeared, at least in recent years.