**UNITED STATES of America,
Appellee,**

v.

**Lemuel Thomas SMITH, Appellant.
No. 12485.**

United States Court of Appeals
Fourth Circuit.

Argued Feb. 3, 1969.

Decided March 4, 1969.

Certiorari Denied May 19, 1969.
See 89 S.Ct. 1751.

J. J. Wade, Jr., Charlotte, N. C. (Charles E. Knox, and Wardlow, Knox,

---

Caudle & Wade, Charlotte, N. C., on brief), for appellant.

Joseph R. Cruciani, Asst. U. S. Atty. (William Medford, U. S. Atty., on brief), for appellee.

Before BOREMAN, BRYAN and WINTER, Circuit Judges.

BOREMAN, Circuit Judge:

Appellant, Lemuel Thomas Smith, was convicted by a jury of violating Title 18 U.S.C. § 659 by having in his possession chattels of a value in excess of One Hundred Dollars, knowing that said chattels had been stolen from a shipment moving in interstate commerce. At the close of the Government's evidence defendant and two others who were named in the indictment moved for judgment of acquittal on the ground that the evidence was insufficient to go to the jury. The court denied the motion as to the defendant but granted the motion as to the others. The defendant did not testify and no evidence was offered on his behalf. The case was submitted to the jury which returned a verdict of guilty. The sole error asserted on appeal is the denial of defendant's motion for judgment of acquittal.

The Government's evidence disclosed that merchandise stolen in Charlotte, North Carolina, from an interstate shipment while in transit by trailer-truck was found and seized during a search conducted on November 2, 1967, by federal agents pursuant to a valid search warrant in certain warehouses controlled and managed by the defendant and owned by his corporation, Southern Fibers, Inc., in Charlotte, North Carolina.[1] Southern Fibers was ostensibly in the "cotton waste" business.

The seized merchandise consisted of 242 pairs of corduroy trousers, with no identifying labels, 47 pairs of overalls with no labels but with size notations written inside the right-hand pockets, 138 rolls of plastic webbing, furniture, cartons of drapes, cartons of men's shirts, a Ford engine and a cardboard box containing shipping labels removed from the shipments of the stolen merchandise. On a trailer owned by defendant's company, Southern Fibers, and parked in front of the company warehouses the agents found one shipping label from the shipment of the stolen merchandise. It is not disputed that a trailer load of merchandise that was moving in interstate commerce was stolen, and that a large part of this merchandise with labels removed was later found on the premises of Southern Fibers. Other evidence indicated that attempts had been made to render the merchandise unidentifiable. Southern Fibers owned a row of six connected warehouses and the stolen property was found in the two warehouses identified as C and D and a metal shed adjoining warehouse D.

At the time of the search and seizure the defendant was not present but his female secretary telephoned him immediately and reported that the FBI agents were conducting a search of the premises. The defendant indicated to her no objection to the search. She later turned over to the defendant a list of the seized merchandise.

The female bookkeeper testified that Smith owned Southern Fibers and that she took her orders from him; that he was there almost every day; that he owned and operated another business under the name of "T. S. Enterprises" but she kept no books for this business and knew little about it. She stated that she knew of no buildings on the premises owned or used by T. S. Enterprises. The secretary testified that she had worked at Southern Fibers from its very beginning and that the defendant was the general manager of the warehouses; *that she had been instructed by defendant never to let anyone past the warehouse doors.*

---

1. The trailer-truck containing the interstate shipments was stolen on or about October 15, 1967, and was found a short time thereafter abandoned at a service station or truck stop which serviced Southern Fibers' vehicles. The contents of the trailer had been removed.

Witness Tribble, the comptroller and warehouseman, who regularly received and shipped merchandise, testified that he worked for Southern Fibers but had nothing to do with warehouses C and D; that he never saw and did not know what went on in those buildings; that he never went into them; that he had no keys to C and D and did not know who had the keys. He was present during the search and opened some of the warehouses but had no keys to C or D or the shed where the Ford motor was found. He disclaimed knowledge of the business of T. S. Enterprises.

Witness Higgins, the maintenance superintendent of Southern Fibers, testified that he had worked for the defendant for the last four or five years; that he usually had keys for all buildings on the premises but did not have keys for C and D on the day of the search; that on that day "they probably could have gotten lost or something. I don't know." When the federal agents told him that they could break the doors open if he did not furnish the keys he told them to go ahead and break them open, stating, "I ain't got nothing in there."

The evidence revealed that on Sunday, the day following the theft of the trailer which contained the stolen merchandise discovered in C and D, two telephone calls were made from one of Southern Fibers' telephones, an unlisted number, to a telephone number in Rock Hill, South Carolina, listed in the name of "Tom Smith." One call was made at 4:18 P.M. and one at 4:55 P.M.

In United States v. Casalinuovo, 350 F.2d 207, 209 (2 Cir. 1965), the court stated:

"The crime in question is 'possession' of goods known to have been stolen from interstate commerce, and it cannot be assumed that Congress was intending to impose criminal liability only upon those persons caught red-handed holding goods they have seen stolen from an interstate truck or train. Accordingly, the courts have held the statute to reach 'constructive' possession as well as actual posses-

sion, i. e., such a nexus or relationship between the defendant and the goods that it is reasonable to treat the extent of the defendant's dominion and control as if it were actual possession. Cf. Holmes, The Common Law, 216 (1881). * * *."

The stolen merchandise was found in locked warehouses C and D located between the offices and the other warehouses. Defendant was actually on the premises almost every day. He was the one who issued orders and instructions to all employees. He had given instructions to his secretary never to let anyone past the warehouse doors. Warehouseman Tribble did not carry keys to buildings C and D and he did not know what business was carried on there. Higgins usually had keys for all the warehouses but did not have keys for C and D on the day of the search. Defendant was the owner and general manager of the premises where the stolen merchandise was found; he was the one for whom everybody worked; he was the one to whom reports were made and one who was present almost daily.

Proof of defendant's possession of the stolen merchandise is based upon circumstantial evidence but it seems that better evidence of his possession could be provided only by direct and positive testimony that he was actually observed in the act of unloading the merchandise from a truck and carrying it into the warehouses. If the trial court concluded that defendant's "possession" could be *inferred* from his ownership and control of the premises and the other facts and circumstances disclosed by the evidence, the inference is neither illogical nor impermissible.

In Rugendorf v. United States, 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964), the defendant was convicted of knowingly concealing stolen fur garments in violation of 18 U.S.C. § 2315. The stolen furs were found in the closet in a game-room in the basement of defendant's home during a search pursuant to a valid search warrant. The defendant and his wife were away on two

weeks' vacation at the time of the search. Four persons had keys to the house, including defendant's brother who was known to be a receiver of stolen property. The furs were hanging in the closet along with a fur piece owned by defendant's wife. Holding the evidence sufficient to sustain the conviction the court observed:

> "As early as 1896 this Court dealt with such situations. In Wilson v. United States, 162 U.S. 613, [16 S.Ct. 895, 40 L.Ed. 1090], Chief Justice Fuller held for a unanimous Court that '[p]ossession of the fruits of crime, recently after its commission, justifies the inference that the possession is guilty possession, and, though only *prima facie* evidence of guilt, may be of controlling weight *unless explained by the circumstances or accounted for in some way consistent with innocence.'*" (Last emphasis supplied.) (376 U.S. 536, 537, 84 S.Ct. 830.)

In the instant case there were circumstances from which knowledge that the property found in the search was stolen could be logically inferred. These warehouses were a one-owner operation with the owner, the defendant, being present almost every day. He would naturally be aware of the activities on the premises and particularly aware of unusual illegal activities in two of the six warehouses. The arrival and storage of a trailer load of valuable merchandise not connected with the legitimate business activities of such a small establishment would hardly go unnoticed. Employees produced keys for all warehouses except C and D where the stolen merchandise was found. Tribble and Higgins, who by their positions of employment would be expected to know what was in all six warehouses, denied knowing or having anything to do with what was stored in warehouses C and D. Higgins usually had keys for all warehouses but could not satisfactorily explain why he did not have them on the day of the search. Obviously attempts had been made to obliterate identification of the merchandise. Labels had been removed from cartons and from the merchandise itself. One box of labels was found in warehouse D. One label was found on the only trailer owned by Southern Fibers. Sizes were written on the inside pockets of some of the stolen overalls. Employees of defendant at Southern Fibers uniformly denied working in or seeing anyone working in warehouses C and D. Some considerable activity and time must have been expended in efforts to render difficult the identification of the merchandise.

In Dirring v. United States, 328 F.2d 512, 515 (1 Cir. 1964), it was held:

> "* * *. The rule is not that an inference, no matter how reasonable, is to be rejected if it, in turn, depends upon another reasonable inference; rather the question is merely whether the total evidence, including reasonable inferences, when put together is sufficient to warrant a jury to conclude that defendant is guilty beyond a reasonable doubt."

In United States v. Valenti, 134 F.2d 362, 364 (2 Cir. 1943), *cert. denied,* 319 U.S. 761, 63 S.Ct. 1317, 87 L.Ed. 1712, the following appears:

> "* * *. It is the court's function to decide whether the evidence is competent to justify certain inferences; it is not the court's function to decide which of various inferences should be drawn. Nor is the jury to be limited to drawing only the inference most favorable to the accused. * * *."

The rule in this circuit was enunciated by Judge Soper in Bell v. United States, 185 F.2d 302, 310 (4 Cir. 1950):

> "* * *. When a motion for a directed verdict of acquittal is made in a criminal case, the sole duty of the trial judge is to determine whether there is substantial evidence which, taken in the light most favorable to the United States, tends to show that the defendant is guilty beyond a reasonable doubt. The possibility that a jury may have a reasonable doubt upon the evidence as to the guilt of the defendant is not the criterion which deter-

mines the action of the trial judge. The decision on that question is for the jury to make and the rule is the same whether the evidence is direct or circumstantial. * * *."

We find no error in the denial of the defendant's motion for judgment of acquittal and the submission of the case to the jury.

Affirmed.