LEIGH M. CLARK, Supernumerary Circuit Judge.
Appellant was convicted of murder in the first degree of Olmstead Copeland, Jr., by shooting him with a pistol.
Although no contention is made on appeal that the evidence was not sufficient upon which to base the finding of the jury, we will summarize enough of it to indicate that the verdict is amply supported by the evidence.
In the early morning of December 14, 1974, the lifeless body of Mr. Copeland, a fireman for the city of Tuscaloosa, was found in the median of 1-59, between Moundville and Greensboro overpasses, south of all Tuscaloosa entrances and exists. Mr. Copeland’s parked truck was three or four hundred yards from his body. Officers were summoned to the scene; search, survey and photographs were made of the area; an intensive and successful investigation was commenced immediately. There was mute evidence, buttressed by many circumstances, that Mr. Copeland had been robbed and shot to death with a pistol. Although his death was established as attributable solely to a 38 caliber bullet in the head, a twelve gauge loaded shotgun shell was found near the body of Mr. Copeland. The shell bore an indentation on its primer indicating an unsuccessful effort to fire it from a shotgun. Between two and three weeks thereafter, a single barrel twelve gauge shotgun was found under appellant’s bed at his home. There was expert evidence that the marking on the shell found at the scene of the crime had been made by the firing pin of the shotgun found under appellant’s bed.
There was testimony by passing motorists to the effect that shortly before Mr. Copeland was killed, his truck with a winch on it was being used by him to extricate an automobile from the low ground of the median in the area where the body of Mr. Copeland and his truck were found. There were descriptive markings of the tires of the automobile in the median.
During December 14, while Tuscaloosa authorities were investigating the homicide of Mr. Copeland, Jefferson County and Birmingham authorities were investigating the suspected homicide of Mr. John Harbin, who was last seen by his wife when he left in his automobile on December 13. Mr. Harbin’s automobile was located in Birmingham on December 16. The automobile had been abandoned. Mr. Harbin’s body in the meantime had been found. The rear bumper of Mr. Harbin’s automobile had been bent as if by a hook from the chain of a winch. There were fresh markings where the mud had apparently been removed by the hook. There was other evidence, such as similarity of the tire markings in the median to the tires on Mr. Harbin’s automobile, sufficient to warrant the conclusion that probably the automobile of Mr. Harbin was the automobile that was extricated from the median by Mr. Copeland shortly before his death. In the automobile was a hat referred to as a “big apple cap,” a velour texture flop hat with a little ball on the top of it, which was identified as a cap or hat that had been previously worn by appellant.
Appellant was arrested on January 3, 1975. After a comprehensive statement of his constitutional rights was given to him, he voluntarily and understandingly made a statement to officers denying his presence in Tuscaloosa the night Mr. Copeland was killed and any and all connection with Mr. Copeland’s death. He made positive detailed statements amounting to an alibi. He was interviewed again on January 3 and again on January 4. About noon January 4, after he had been again advised fully as to his constitutional rights, including the right to an attorney, and he had expressly waived such rights, he made a lengthy written statement admitting that he was present when Mr. Copeland was killed. He narrated in detail that he and James Turk, and another man, had gone from Birming *101 ham to Tuscaloosa in an automobile; that they passed the last Tuscaloosa exit before realizing it and made an effort to cross over the median to the northbound traffic lane, but in doing so the automobile bogged down. Mr. Copeland arrived going south in a truck with a winch; he extricated the automobile from the median. There was a short discussion between Copeland and Turk about payment for the service rendered. Defendant said that Turk shot Copeland with a pistol, a 38 pistol. He further said that the third man with him and Turk on the trip from Birmingham to Tuscaloosa was a man he called “Bobo” but that he had not seen him since. He claimed that he verbally protested the action of Turk but seemed to explain or excuse further action on his part by fear of injury or death at the hands of Turk.
There were many other circumstances revealed by the evidence tending to connect the defendant with the crime, which, need no recitation here for the purpose of the conclusions herein reached. No contention is made, and none can be made with reason, that the evidence was not sufficient to support the verdict of the jury. The jury was fully justified in rejecting defendant’s claim of innocence of felonious participation in the murder and robbery. In testifying on the trial, he stated he attempted to run away from the scene after Mr. Copeland was shot but he heard someone say, “Nigger, where you going?”, that he then “stopped because I knowed that they had a gun.” He said that Bobo had a sawed-off shotgun. Such was the shotgun that was found under appellant’s bed. He admitted that he knew Mr. Copeland was robbed, that Turk had gone through Mr. Copeland’s pockets. He said they attempted to take Mr. Copeland’s truck and move it north, but they didn’t go far because they couldn’t get the yellow light turned off the truck. He said the other two obtained a large number of articles from the truck and put them in the car, including a shotgun in a case. They soon ran out of gas, near a motel. Turk went to a filling station and got some gas and they then proceeded toward Birmingham, but'they gave out of gas again below Bessemer. After obtaining some gas they moved on to Bessemer where they were stopped by two policemen, who interrogated them but told them to go ahead. They drove on to Birmingham and Turk let appellant off at appellant’s home.
In attempting to explain the presence of the sawed-off shotgun under his bed, appellant said that he had been handed the gun by Turk the summer before and appellant had kept it for Turk, but that Turk thereafter came and got it, but returned it to appellant after the night of the killing of Mr. Copeland, appellant stating that this was on “December 16, 15th, somewhere in there.”
Appellant’s sole insistence on a reversal is grounded on the action of the trial court in overruling defendant’s motion to suppress evidence obtained upon a search of defendant’s residence on January 3, 1975, particularly the shotgun found under his bed. The search was by warrant issued the same day on the lengthy and detailed affidavit of Sergeant H. H. Brooks of the Jefferson County Sheriff’s Department. The particular shotgun was introduced in evidence over defendant’s objection. The affidavit for the search warrant showed that affiant with others had made almost continuous investigation of the death of Mr. Copeland and the death of Mr. Harbin since December 13, 1974. The affiant had talked with Tuscaloosa authorities and with Jefferson County and Birmingham authorities. William James Turk had been arrested on January 2, 1975, and an S & W pistol, the property of Mr. Copeland, was in Turk’s possession. A search warrant was obtained for Turk’s residence and among numerous items there found was a clip for an S & W pistol. A shotgun belonging to Copeland was not found. A billfold belonging to Copeland was not there. In the affidavit of Sergeant Brooks for a search warrant, he stated that there was probable cause for believing and that he did believe that the shotgun and billfold of Copeland were at the residence of defendant; he also stated that he had probable cause for believing *102 and believed that some items belonging to Mr. Harbin were at the residence of defendant. Before obtaining the search warrant for the residence of defendant, Sergeant Brooks talked with three personal acquaintances of Turk and with the employer of both Turk and defendant. Two of the acquaintances told Sergeant Brooks that they had seen Turk and a man by the name of Willie, who one said was called “Big Willie,” together on December 13, 1974. One said that Turk and Willie carried her to work at approximately 2:30 P.M. that day and that Turk told her the next morning that “he and Willie had gone to Tuscaloosa to see a girl and that they ran off the road and a man pulled them out and that he shot and killed the man and stole his pistol.” and that Turk told her at the time that he had killed two white men that night. Learning the name of the employer of Turk and “Big Willie,” Sergeant Brooks called the employer and was informed by the employer that “Willie’s name was Willie Alexander,” who lived at the address of the residence for which the search warrant was obtained.
The search of the residence did not reveal the items specifically listed in the affidavit relative to the homicide of Mr. Copeland, but the shotgun found under defendant’s bed was seized.
In arguing that the court was in error in overruling defendant’s motion to suppress the evidence presented as to what was found upon search of defendant’s room in the house where he lived and in overruling defendant’s objection to the admission in evidence of the shotgun found under his bed, a gun which the evidence on the trial showed ejected an unspent shell at the scene of the crime, appellant contends that there was a violation of his right to be secure in his house against an unreasonable search and seizure; that the search warrant was invalid in that there was no probable cause for searching the particular premises for the specific articles described therein.
Appellant relies largely upon Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723, in which it was stated:
“Although an affidavit may be based on hearsay information and need not reflect the direct personal observations of the affiant, Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 [78 A.L.R.2d 233], the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed, see Rugendorf v. United States, 376 U.S. 528, 84 S.Ct. 825 [11 L.Ed.2d 887], was ‘credible’ or his information ‘reliable.’ Otherwise, ‘the inferences from the facts which lead to the complaint’ will be drawn not ‘by a neutral and detached magistrate,’ as the Constitution requires, but instead, by a police officer ‘engaged in the often competitive enterprise of ferreting out crime,’ Giordenello v. United States, supra, 357 U.S. [480] at 486, 78 S.Ct. [1245] at 1250 [2 L.Ed.2d [1503] at 1509]; Johnson v. United States, supra, 333 U.S. [10] at 14, 68 S.Ct. [367] at 369 [92 L.Ed. [436] at 440], or, as in this case, by an unidentified informant.”
Appellant complains that the affidavit upon which the search warrant was issued did not contain a statement by the affiant that the persons from whom he obtained the information were credible or that the information obtained from them was reliable and that therefore the affidavit did not meet the test of Aguilar. Although the majority opinion in Aguilar, adopting the language employed in the affidavit, uses the word “informant” instead of the word “informer,” the dissenting opinion uses both words without distinction, and most opinions thereafter in which Aguilar is relied upon use the two words interchangeably, it should be noted, we think, that in most instances the information considered came from an “informer” rather than an “informant,” as those words are distinguished by Webster’s New International Dictionary (2d ed.) under “informant” as follows:
“An informant is one who gives information of whatever sort; an informer is one who informs against another by way of accusation or complaint. Informer is of *103 ten, informant never, a term of opprobrium.”
Under “informer” the same authority states:
“One who informs against another; specif., Law, one who informs a magistrate of a violation of law; one who lays an information; esp., one (often called a common informer) who makes a practice of informing against others for violations of penal laws, particularly when the informer may receive as a reward a share of the money penalty imposed.”[1]
Whether the failure to distinguish between an “Informant” and an “Informer” accounts for some of the confusion and the “sound and fury” decried in United States v. Bell, 457 F.2d 1231 (5th Cir. 1972), the opinion in such case should have removed a great deal of the confusion that previously existed relative to the application of the Aguilar and Spinelli[2] requirements. In Bell it was held that the requirement of a showing of credibility of an informant (informer) is not applicable to information obtained from a victim or from an eyewitness. The reason should have been obvious and is expressed in Bell as follows:
“ . . . We have discovered no case that extends this requirement to the identified bystander or victim-eyewitness to a crime, and we now hold that no such requirement need be met. The rationale behind requiring a showing of credibility and reliability is to prevent searches based upon an unknown informant’s tip that may not reflect anything more than idle rumor or irresponsible conjecture. Thus, without the establishment of the probability of reliability, a ‘neutral and detached magistrate’ could not adequately assess the probative value of the tip in exercising his judgment as to the existence of probable cause. Many informants are intimately involved with the persons informed upon and with the illegal conduct at hand, and this circumstance could also affect their credibility. None of these considerations is present in the eyewitness situation such as was present here. Such observers are seldom involved with the miscreants or the crime. Eyewitnesses by definition are not passing along idle rumor, for they either have been the victims of the crime or have otherwise seen some portion of it. A ‘neutral and detached magistrate’ could adequately assess the probative value of an eyewitness’s information because, if it is reasonable and accepted as true, the magistrate must believe that it is based upon firsthand knowledge. Thus we conclude that Aguilar and Spinelli requirements are limited to the informant situation only.”
We need go no further than the sound principle established in Bell to hold that the position of appellant is not tenable as based upon the contention that the affidavit for the search warrant did not show that the people from whom the affiant obtained his information were credible informants. Not one among the many identified persons giving the information could be classified as an informer in the sense that Bell holds was meant by Aguilar and Spi-nelli. The affidavit was based on information obtained by the affiant, as shown by the affidavit, over a period of nearly three weeks, from the wife of one of the victims of a homicide and robbery, several law enforcement officers of Tuscaloosa County- and Jefferson County, a ballistics expert from the State Department of Toxicology, persons who had talked with Turk and who identified defendant as his companion on the night Mr. Copeland was killed, defendant’s employer, and others, and was rein *104 forced by the viewing of the affiant himself of several objects that formed links in the chain connecting defendant with the murder and robbery of Mr. Copeland. From all of this, the affiant concluded, and he had just ground to conclude, that he believed and that he had probable cause for believing that the items listed in the warrant were in the residence of defendant. As the residence of Turk had been searched and the particular items listed in the affidavit for the warrant for the search of defendant’s residence were not found in Turk’s residence, where was a more likely place for them to be than in the room occupied by defendant?
To uphold our conclusion, we are not required to go as far as United States v. Darensbourg, 520 F.2d 985 (5th Cir. 1975), in which a basis for the dissent of Judge Godbold was that the informant, he thought, a fifteen-year-old youth, had such a connection with the events involved that “there was risk of his tip’s having been given to exculpate himself or to curry police favor useful in the event he became a suspect.” No such derogation can be made of any of the informants in this case.
Although the shotgun found under defendant’s bed was not the shotgun described in the affidavit and search warrant, that is, a shotgun believed to have been owned by and stolen from Mr. Copeland, its seizure was unquestionably legal. It was an illegal sawed-off shotgun, under the legal limit both in the distance between the tip of the barrel and the other end of the stock and in the length of the barrel itself. In Sheppard v. State, 49 Ala.App. 674, 275 So.2d 353, 356, it is stated:
“ . . .If during a lawful search under a warrant the police, searching in the manner authorized, find evidence of another offense not related to the crime for which the warrant was issued, it may nevertheless be lawfully seized. Lucy v. State [46 Ala.App. 484, 243 So.2d 756].”
In addition, and more, importantly, the gun seized and admitted in evidence over the objection of defendant was one of the most persuasive links in the chain of circumstances connecting defendant with the crime charged. According to some of the evidence, it was the gun used and sought to be shot by a companion of Turk in an effort to aid Turk in killing and robbing Mr. Copeland. Dispositive of appellant’s contention that the fact that it was not listed in the warrant precluded its admissibility as evidence is the following:
“Although the weapons seized were not described in the search warrant, such evidence having a nexus with the crime under investigation may be seized at the same time as the described evidence. Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947); United States v. Burks, 508 F.2d 672 (5th Cir. 1975); United States v. Kane, 450 F.2d 77 (5th Cir. 1971), cert. denied, 405 U.S. 934, 92 S.Ct. 954, 30 L.Ed.2d 810 (1972); Bryant v. United States, 252 F.2d 746 (5th Cir. 1958).” United States v. McCoy, 515 F.2d 962 (5th Cir. 1975)
The court was not in error in overruling defendant’s motion to suppress the evidence or in admitting the gun in evidence over objection of defendant.
Our search of the record fails to reveal any error prejudicial to defendant. The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Supernumerary Circuit Judge Leigh M. Clark, serving as a judge of this Court under Section 2 of Act No. 288 of July 7, 1945, as amended; his opinion is hereby adopted as that of the Court. The judgment below is hereby
AFFIRMED.
TYSON, HARRIS, DeCARLO and BOOKOUT, JJ., concur.
CATES, P. J., not sitting.

. The quotations from Webster’s Second Edition are substantially the same as in the First Edition. It is to be noted that in the current (Third) edition the detailed distinction is not observed. This suggests the thought that perhaps the reluctance to defer disparagingly to one from whom information is obtained has contributed to a synonymity of the words. Black’s Law Dictionary (4th ed.) defines “Informer” and “Common Informer” with resemblance to the quotations from Webster. It does not recognize “Informant.”

. Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637.