GRIMES, Chief Judge.
This is an appeal by the state from orders suppressing the seizure of evidence pursuant to two separate search warrants.
On December 20, 1977, Circuit Judge John A. Gilbert issued a search warrant authorizing the search of appellee’s apartment. The search warrant was executed and certain incriminating evidence was seized. However, the apartment appeared to have been vacated,, so Detective Law sought a new search warrant for an apart *652 ment to which appellee had moved. The affidavit for the new search warrant contained the same statement of facts used to obtain the earlier search warrant plus a recitation of information learned by the detective from his search of the first apartment. The new search warrant was issued by Circuit Judge James A. Lenfestey on December 22, 1977. This search warrant was executed and further property was seized.
The appellee was later indicted for the murder of John Redmond, Jr. and William Steven Weissman and also charged with the possession of marijuana. The appellee moved to suppress the evidence obtained through both searches. It was agreed that if the first search was deemed invalid the second search would also have to fall. The court ruled that the affidavit in support of the first search warrant was legally insufficient, and the court entered orders suppressing the evidence seized as a result of both searches. As a basis for its conclusion, the court noted “that the affidavit upon which the first search warrant was issued is woefully inadequate in that the affiant does not even name the persons from whom he received the information which is set forth in the chronology of events, so the court has no way of knowing who furnished that information, whether or not that person had an opportunity to observe what is set forth there in that chronology of events or whether or not it was hearsay or hearsay twice or three times removed.”
In Aguilar v. Texas, 378 U.S. 108, 114, 84 S.Ct. 1509, 1514, 12 L.Ed.2d 723, 729 (1964), the United States Supreme Court set forth the requirements of an affidavit for a search warrant based upon hearsay evidence.
Although an affidavit may be based on hearsay information and need not reflect the direct personal observations of the affiant, Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697, 78 A.L.R.2d 233, the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed, see Rugendorf v. United States, 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887, was “credible” or his information “reliable. . . ”
However, that same court warned against the supertechnical interpretation of such affidavits when, in United States v. Ventresca, 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684, 689 (1965), it said:
If the teachings of the Court’s cases are to be followed and the constitutional policy served, affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.
In this appeal the state argues that even though the affidavits did not specifically state who supplied Detective Law with what facts, one can determine this information from a commonsense reading of the statements within the affidavit. Keeping in mind the dictates of Ventresca, we think it reasonable to make the following conclusions from the quoted portions of the affidavit:
Affiant is a member of the Hillsborough County Sheriff’s Department and has been so employed since March of 1970. The Affiant is presently assigned to the Criminal Investigation Division as a detective and is currently assigned to the Crimes Against Persons Bureau, charged with investigations of Murder.
Your Affiant has personally participated in the investigation of the murder of John B. Redmond, Jr., since the date his *653 body was recovered from a shallow grave on December 17, 1977. The information related below was obtained by your Affi-ant through interviews of persons connected with this investigation.
The following is a chronology of events as pieced together through writer’s investigation. The chronology will be followed by a concluding paragraph.
This preface simply reflects that Detective Law obtained the facts thereafter stated through personal interviews conducted during his investigation of the Redmond murder.

1 DEC 77

John Redmond, Jr., drives to the Windjammer Apartment, the residence of Francis David Brew AKA Sunshine. While there Redmond told Francis that he wanted $5,000.00 back that he had given him about a week prior because he needed it for another deal. The money was given back in the form of 50 one hundred dollar bills.
Since Redmond is dead, the logical conclusion to be drawn from this paragraph is that Brew related the details of a transaction between himself and Redmond.

2 DEC 77

William Steven Weissman arrived in Tampa from Melboum (sic) Florida. He had approximately $6,000.00 in cash on his person. Weissman was picked up from the airport by Karen Meredith who observed him to be very nervous. Karen took him to Redmond’s residence which is located at 7228 Potts Rd., Riverview, Florida. During that afternoon Jorge Dominguez and a person known as “Chee-to” arrive. At approximately 7:00 p. m., David Brew arrives and overhears the four talking about a cocaine deal. Jorge got up several times and telephoned an unknown person asking if the “man” had come yet.
Karen Meredith obviously furnished the information concerning Weissman’s arrival at Redmond’s residence with the $6,000. Brew overheard the discussion about the cocaine deal. It appears with somewhat less certainty that Brew was the source of the statement that appellee made telephone calls asking if the “man” had come yet. In any event, this information was not essential to the showing of probable cause.

3 DEC 77

No indication of Redmond or Weissman leaving the Potts Road address.

4 DEC 77

No activity until the afternoon hours when Redmond and Weissman left the house and went target practicing with a 38 special revolver and a 9MM automatic.
The source of this information is not indicated, but the information is not particularly pertinent to probable cause.

5 DEC 77

Approximately 1500 hours Redmond and Weissman arrive at the residence of Francis Brew. They have a 6 pack of beer and said they were in the area killing some time. They stayed for about one hour and left not saying where they were going. (Brew described the manner in which Redmond was dressed and was the same as he was when his body was discovered.) At approximately 12:00 midnight John Redmond’s vehicle is discovered in the airport parking lot. (Weissman’s body in the trunk). The windshield wipers were on indicating that the vehicle was driven to the airport sometime after 20:05 hours when it started raining. (Weissman’s body was wrapped in a green thermal banket (sic) and a white “Grant” sheet, shot twice, wallet missing).
The arrival of Weissman and Redmond at the Brew residence is specifically attributed to Brew. The finding of Redmond’s vehicle was a fact obviously known by the police.

6 DEC 77

Karen calls Jorge Dominguez inquiring about Redmond’s absence. Dominguez siad (sic) that he had seen Redmond Monday the 5th and Redmond told him that he was leaving town. (Redmond nor Weissman took any personal items with them that would indicate they intended to leave.) Dominguez said that he would see Karen later and Figure (sic) out where Redmond went. He never did.
*654 Karen Meredith, apparently, recounted the substance of a telephone conversation she had with the appellee.

6 or 7 DEC 77

Margot Wayman, the apartment manager for the Green Oak apartments on Skipper at 30th St. extention (sic), observes that Apt. 118, the Jorge Dominguez residence had its drapes removed and a red blanket up. She asked Debbie Dominguez (Jorge’s sister) about the drapes and Debbie said that they had burned the old drapes and were in the process of buying new ones.
This firsthand information was specifically furnished by Margot Wayman, apartment manager.

Week of 5-9 DEC 77

Keith Souders of Apt. 119 stated that he heard what sounded like at least two firecrackers exploding at about 22:00 hours.
This is firsthand information specifically furnished by Keith Souders who lived in a nearby apartment.

15 DEC 77

Weissman is found in Redmond’s car at Tampa International Airport, dead and decomposed.
The police knew that Weissman’s body was found in Redmond’s car.

17 DEC 77

Redmond is found hurried (sic) in a shallow grave 8/io mile north of the Dominguez apartment. He was shot twice and laying on a cannon percale Rex-a-matic sheet. His wallet was missing.
The police knew that Redmond’s body was found less than a mile from appellee’s apartment.

20 DEC 77

Your Affiant went to the Dominguez apartment and observed what appears to be blood on the sliding glass door of the apartment (where the now replaced drapes had been).
A photo of the sliding glass door is attached as exhibits B and C.
This evidence was specifically observed by affiant.
Because of your Affiant’s training, past experience and recent investigation your Affiant has reason to believe and does believe that Redmond and Weissman were involved in a drug deal with Jorge Dominguez and “Cheto” which began on approx. 12/2/77 and terminated with Redmond’s and Weissman’s and (sic) bodies being found on 12/17/77 and 12/15/77 respectively. Both bodies were shot and wrapped in bed clothing. Therefore, your Affiant has reason to believe the blood stain on the sliding glass door at apt. 118, 4106 Skipper Road Lutz, Hills-borough County, Florida and the fact that the draperies covering that glass door were removed on approx. 12/6-7/77 that Weissman and Redmond were and further that a neighbor heard what appeared to be “firecrackers” during the week of 12/5-9/77 leads your Affiant to believe that both Redmond and Weissman were murdered at apt. 118, 4106 Skipper Road, Lutz, Hillsborough County, Florida.
The above passage is Detective Law’s summary of the foregoing facts which formed the basis for his belief that Redmond and Weissman were murdered at appellee’s first apartment.
It is evident that all the pertinent facts set forth in the chronological recitation were either known personally by the affiant or other members of the police or were reported from firsthand knowledge to the affiant by Brew, by Meredith or by persons living in nearby apartments. In the case of information furnished to affiant by others, enough facts were set forth in the affidavit to show how these persons had come to know what they reported. Moreover, we believe that the information given to affiant by others[1] was sufficiently cor *655 roborated by independent circumstances so as to meet the test of reliability.[2] Aguilar v. Texas, supra.
Despite its technical imperfections, we believe that the affidavit was sufficient as measured by the standard of review set forth in United States v. Ventresca, supra, at 380 U.S. 109, 85 S.Ct. 746, 13 L.Ed.2d 689.
Recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police. However, where these circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner. Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants. .
See State v. Jacobs, 320 So.2d 45 (Fla.2d DCA 1975).
Not only were the same facts submitted in the affidavit for the second search warrant, but Detective Law was also able to add that he had found substantial amounts of human blood on the carpet and the furniture in appellee’s apartment, a bullet fragment in the wall, and a .22 caliber casing on the floor. He further stated that Redmond had been shot with a small caliber projectile which appeared to be a .22 bullet. At this point the facts in the second affidavit were obviously sufficient to obtain a search warrant for appellee’s new apartment.
In his brief the appellee suggests that even if this court were to determine the affidavits to be sufficient, the evidence seized by virtue of the second search warrant should be suppressed because in executing this warrant the police violated Section 933.09, Florida Statutes (1977), which prohibits forcible entry. Unlike the question of the legality of the search warrants, this issue was a factual question about which testimony was taken at the hearing. The court found that the warrant had been properly executed, and there is competent substantial evidence to support this finding.
The orders of suppression are reversed.
SCHEB and DANAHY, JJ., concur.

. These were more than anonymous tips. The credibility of a disinterested citizen who reports what he has previously observed in response to police interrogation ought to be acceptable on its face in the absence of anything suggesting the untrustworthiness of such information. Of course, the credibility of Brew and Meredith must be viewed with closer scrutiny because it *655 appears that they were well acquainted with the principals in this case if not themselves involved in criminal activities.

. The fact that blood stains were found on the sliding glass door of appellee’s apartment in which the drapes had just been replaced was a particularly incriminating circumstance which can hardly be deemed coincidental.