[Crim. No. 13281.    Second Dist., Div. One.    Feb. 21, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. RAMON GONZALES MORALES, Defendant and Appellant.

Donald F. Roeschke, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, and Jack R. Winkler, Deputy Attorney General, for Plaintiff and Respondent.

LILLIE, J.—Defendant was found guilty of possession of heroin (Health & Saf. Code, § 11500); he appeals from the judgment.

On the basis of his own personal knowledge that defendant had been engaged in the sale of narcotics (marijuana and heroin), acquired from his two prior arrests of defendant, one involving a large quantity of marijuana and the other, possession of heroin, and on information received by him from an undisclosed informant that defendant was selling narcotics at his apartment on North Roselake, Officer Ridenour began a surveillance of the premises, in the course of which he saw defendant walk out of the back door of his apartment onto a wooden landing, stand there from three to five seconds ''just

looking around," turn around, face the door, jump up, reach into a drain spout and remove a brown paper sack from the rain gutter above the door, glance around again for several seconds, turn in all directions and re-enter the apartment. Five to ten minutes later one Batista, also personally known to Officer Ridenour to have been arrested for possession of narcotics and as a suspected dealer in large quantities of marijuana and heroin, parked his car at the rear of defendant's apartment and ascended the rear stairway; when he reached the back door defendant opened it for him, stepped outside and looked around, then both entered the apartment. Five minutes later they stepped outside, engaged in a conversation for a minute and Batista departed.

The officers followed Batista's vehicle to Rosemont where he was trying to negotiate a U-turn; they stopped in front of his vehicle and got out of the car saying, "Police officers" in a loud voice. Suddenly Batista drove his vehicle into the police car. When Officer Ridenour approached the left door of Batista's vehicle, he saw a piece of paper in Batista's hands; Batista shouted, "Get out of here, Ridenour" but the officer reached into the window and grabbed Batista by the neck. When Batista tried to tear the piece of paper, the officer could see that it contained a powder; when some of it struck him in the mouth it had the bitter taste of heroin. At this point Batista shifted the car into reverse and accelerated backwards striking another police vehicle. Officer Ridenour, still entangled with Batista, suffered personal injury as a result of the impact. Other officers assisted him in apprehending Batista. When they approached him both of his hands were out of the window attempting to tear the piece of paper. Two officers forced his hand open and removed a portion of a page from a T. V. Guide containing a brownish-colored powder resembling heroin; similar powder was found on the side and in the interior of Batista's vehicle and on the roadway immediately adjacent to the left door. Other papers found on the ground were portions of similar pages from a T. V. Guide. (Batista was charged with possession of heroin, battery on a police officer and a prior felony conviction.)

Immediately after arresting Batista Officer Ridenour and Sergeant Leeds went to defendant's residence. As they stood in front of the rear door they saw defendant through the glass window in the door move toward the doorknob and then brace himself against the door handle with both hands. Sergeant Leeds told him to open the door, "Police officers," and

shouted, "Open up, Tito." They knew that defendant's wife was in the apartment having previously seen her in the kitchen through binoculars. Officer Ridenour testified "we felt that contraband—narcotics—would be destroyed unless we effected immediate entry," thus they forced the door open. As they entered the apartment, they heard the commode flushing and water running; in the bathroom the water was running in the bowl. Defendant's wife was in the rear of the apartment. Defendant was arrested and advised of his constitutional rights.

Following the arrest the officers searched the apartment and Officer Ridenour found a thin line of brownish powder resembling heroin on the kitchen table and on the sink. A T.V. Guide was found on a coffee table with several pages removed, and a brown paper sack was in the waste paper basket. The pieces of paper found on Batista matched the torn pages of the T. V. Guide. The three items (Exh. 1) obtained from Batista's car were (1) 0.12 gram of 1 to 5 percent heroin, (2) less than 1 milligram brown material "insufficient" and (3) .09 gram of 5 percent heroin. Taken from defendant's apartment was 0.12 gram of 1 to 2 percent heroin (Exh. 2). Officer Ridenour testified that the average heroin on the market today runs about 3 to 5 percent; that the average dosage is a capsule containing .09 gram of 3 percent heroin.

Defendant testified that he was not aware of the presence of heroin in his apartment.

Appellant contends that there is insufficient evidence to support the judgment because there is no showing of possession of a quantity of narcotics sufficient for sale or consumption. He argues that since the trial judge made no specific finding on this issue. and *People* v. *Leal,* 64 Cal.2d 504 [50 Cal.Rptr. 777, 413 P.2d 665], and *People* v. *McCarthy,* 64 Cal.2d 513 [50 Cal.Rptr. 783, 413 P.2d 671], were decided within a month of the trial, it is likely that the judge did not study them and thus did not decide there was sufficient narcotic for sale or use. The record establishes the contrary and demonstrates appellant's complete lack of good faith in making such a charge.

The transcript of the testimony taken at the preliminary hearing reflects an extensive argument on this issue and a discussion of *People* v. *Leal,* 64 Cal.2d 504 [50 Cal.Rptr. 777, 413 P.2d 665], and *People* v. *McCarthy,* 64 Cal.2d 513 [50 Cal.Rptr. 783, 413 P.2d 671], extending over a period of two days—May 13 and 16, 1966. Finally the prosecution recalled

Officer Ridenour who testified concerning the average dosage of heroin. Further argument followed and the committing magistrate found the quantity and quality of heroin recovered from defendant's apartment—0.12 gram of 1 to 2 percent heroin—to be "saleable and usable" within the rule of the *Leal* and *McCarthy* cases, and held defendant to answer. The cause was submitted to the trial judge on the transcript of the testimony taken at the preliminary hearing. The record shows that the judge read the transcript and that further testimony was taken; then defense counsel argued to the trial judge that the amount of heroin found in defendant's apartment was minimal. While he should have done so, defense counsel failed to mention *Leal* and *McCarthy* by name, but it is obvious that these two cases were the legal basis of his argument. In finding defendant guilty, no specific findings were made but implicit in defendant's conviction is the trial judge's finding that the minimal requirements of *Leal* and *McCarthy* had been met. Contrary to appellant's claim that these cases were decided only about a month prior to trial and it is unlikely that the trial judge considered them, *People* v. *Leal*, 64 Cal.2d 504 [50 Cal.Rptr. 777, 413 P.2d 665], and *People* v. *McCarthy*, 64 Cal.2d 513 [50 Cal.Rptr. 783, 413 P.2d 671], were decided May 2, 1966, preceding the termination of defendant's trial (November 5, 1966) by a full six months, and while we are entitled to assume in favor of the judgment that the trial judge considered the applicable law in finding defendant guilty, we know him to be long experienced in the trial of criminal cases and as a certainty that long before defendant was tried he was familiar with the rules of *Leal* and *McCarthy*.

The officers found in a thin line on the kitchen table, 0.12 gram of 1 to 2 percent heroin which they brushed off into a paper with another piece of paper. The totality of the evidence viewed in a light most favorable to the judgment points to one of two conclusions—that the heroin was either the accidental spillage from the transfer of the narcotic from defendant to Batista (the heroin found on Batista was wrapped in a torn section of a T. V. Guide which matched the torn pages of the T. V. Guide found in defendant's apartment) or that which remained after a hurried destruction of a larger amount of the narcotic by defendant or his wife just before the officers forced the door. (When the officers entered the apartment they heard the commode flushing and water running in the bathroom; defendant's wife was in the bedroom.) In any event, the amount was not minimal but sufficient for

one dosage, and the drug was in a saleable or usable condition. Assuming that the heroin was left on the table as a result of the transfer of heroin to Batista, it appears likely that had not the officers arrived when they did defendant would have salvaged it for his own use or for sale. While the average dosage is .09 gram of 3 percent heroin, Officer Ridenour's testimony indicates that it depends on the user and "how often they fix and how much stuff, of course, they have at their disposal," and how the narcotic is cut and sold. Here, too, the trial court was justified in considering the well known problem of the sale of below quality drugs in street narcotic traffic. While *People* v. *Leal,* 64 Cal.2d 504 [50 Cal. Rptr. 777, 413 P.2d 665], and *People* v. *McCarthy,* 64 Cal.2d 513 [50 Cal.Rptr. 783, 413 P.2d 671], hold that a conviction for possession of narcotics must be based on proof of possession of a quantity of narcotics sufficient for sale or consumption, the amount and quality involved consisted of minute crystalline residue coating a small spoon (*People* v. *Leal,* p. 505), and minute traces of morphine residue on two pieces of cotton (*People* v. *McCarthy,* p. 514) and in neither case was the amount or quality of the narcotic usable or saleable. In each the narcotic consisted of residue—the precipitation resulting from reduction of the drug for use and left on the paraphernalia used in administering the narcotic—a product completely useless to the drug user. Here the heroin was neither a minute amount nor useless for either sale or consumption. Its form was in no manner changed and was not residue as in *Leal* and *McCarthy*. It was heroin in its normal powdery form in a condition and of a quality for immediate use. Further, it was in an amount sufficient for consumption or sale.

The last issue raised is the validity of defendant's arrest, the subsequent search of his apartment and the seizure of the heroin. The same having been argued below and the trial judge having determined the validity of the arrest and the reasonableness of the search, the only way such determination may be obviated is by a showing that there was no substantial evidence in support of it. (*People* v. *Swayze,* 220 Cal.App.2d 476, 489 [34 Cal.Rptr. 5].)

Officer Ridenour had previously personally arrested defendant twice on narcotic charges (heroin and marijuana) and knew he had been engaged in the sale of narcotics; this alone is not sufficient to constitute probable cause but it is relevant on the issue. (*People* v. *Machel,* 234 Cal.App.2d 37,

296

48 [44 Cal.Rptr. 126].) ▮ Also relevant was the information that defendant was dealing in narcotics at his apartment, received by the officer from an undisclosed informant (*Willson* v. *Superior Court,* 46 Cal.2d 291, 294 [294 P.2d 36]; *People* v. *Cedeno,* 218 Cal.App.2d 213, 219 [32 Cal.Rptr. 246]); further, it entitled the officers to seek out defendant and question him. (*People* v. *Mickelson,* 59 Cal.2d 448, 452 [30 Cal.Rptr. 18, 380 P.2d 658].) ▮ However, at this point the officers did no more than watch the premises. In the course of their surveillance they observed defendant's furtive conduct; his actions on the porch in looking around, jumping up and reaching into the drain spout for a package, then looking around before re-entering the premises, were highly suspicious to an experienced narcotic officer, particularly in view of his information concerning defendant. His suspicion that defendant was in fact dealing in narcotics on the premises was, to a certain extent, confirmed when five or ten minutes later defendant admitted to his apartment a known narcotics offender who stayed but five minutes. The circumstances of which the officers were aware "warranted the inference that it was probable that there was a supply of narcotics in the defendant['s] . . . residence." (*People* v. *King,* 234 Cal.App.2d 423, 428 [44 Cal.Rptr. 500]; *People* v. *Melchor,* 237 Cal.App.2d 685, 693 [47 Cal.Rptr. 235].) Further investigation by the officers was justified. Thus, they properly sought out Batista for questioning by following him, and stopped him. (*People* v. *Mickelson,* 59 Cal.2d 448, 452 [30 Cal.Rptr. 18, 380 P.2d 658].) When confronted by the officers, Batista's conduct was more than sufficient to justify their belief that a felony was being committed in their presence. (Pen. Code, § 836.) They found heroin on the person of Batista whom the officers had seen leaving defendant's apartment. Under the circumstances the officers could reasonably conclude that the persons inside of defendant's premises similarly were in possession of the contraband. (*People* v. *Sandoval,* 65 Cal.2d 303, 307 [54 Cal.Rptr. 123, 419 P.2d 187].)

Confronted with all of the above circumstances, which proved accurate the information given to him by the undisclosed informer (*People* v. *Melchor,* 237 Cal.App.2d 685, 689 [47 Cal.Rptr. 235]), Officer Ridenour had reasonable cause to believe that defendant was committing a felony (possession of narcotics), and properly arrested him. (Pen. Code, § 836; *People* v. *Torres,* 56 Cal.2d 864, 866 [17 Cal.Rptr. 495, 366 P.2d 823]; *People* v. *Fischer,* 49 Cal.2d 442, 446 [317 P.2d 967]; *People* v. *Ingle,* 53 Cal.2d 407, 412 [2 Cal.Rptr. 14, 348

P.2d 577].) ■ "To constitute probable cause for arrest, a state of facts must be known to the officer that would lead a man of ordinary care and prudence to believe, or to entertain a strong suspicion, that the person arrested is guilty." (*People* v. *Hillery*, 65 Cal.2d 795, 803 [56 Cal.Rptr. 280, 423 P.2d 208]; *People* v. *Cockrell*, 63 Cal.2d 659, 665 [47 Cal.Rptr. 788, 408 P.2d 116]; *Rideout* v. *Superior Court*, 67 Cal.2d 471, 473-474 [62 Cal.Rptr. 581, 432 P.2d 197].)

■ As the officers stood in front of the rear door of defendant's apartment, through the glass window in the door they saw him move toward the doorknob and then brace himself against the door handle with both hands. Sergeant Leeds told him to open the door, "Police officers," and shouted, "Open up, Tito," demanding entrance. Having just witnessed Batista's attempt to destroy the narcotics, knowing defendant's wife to be on the premises and believing narcotics to be therein, defendant's movements in connection with the door led them to conclude that defendant was trying to barricade the door until his wife was able to dispose of the contraband; the officer's testimony was that he "felt that contraband—narcotics—would be destroyed unless we effected immediate entry." Thus, after demanding entrance they forced the door. Their suspicions were confirmed for as they entered they heard the commode flushing and water running in the bathroom; defendant's wife was in the bedroom. It was not unlawful for the officers to force entry after demanding entrance even though they did not explain the purpose for which admittance was desired (Pen. Code, § 844), since the officers were not required to afford any person in the house the opportunity of disposing of contraband before they could seize it. (*People* v. *King*, 234 Cal.App.2d 423, 433-434 [44 Cal.Rptr. 500]; *People* v. *Carrillo*, 64 Cal.2d 387, 392 [50 Cal.Rptr. 185, 412 P.2d 377]; see *People* v. *Gastelo*, 67 Cal.2d 586, 588-589 [63 Cal.Rptr. 10, 432 P.2d 706].)

■ Soon after the officers entered, they observed narcotics on the kitchen table. The arrest having been valid, the subsequent search of the premises and seizure of the evidence were lawful.

The judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.