[Crim. No. 4718. Fourth Dist., Div. Two. June 22, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
ARTHUR WILLIAM BUCHANAN, Defendant and Appellant.

## COUNSEL

Jean Rheinheimer, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, William E. James, Assistant Attorney General, Jay D. Coulter and Harley D. Mayfield, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KAUFMAN, J.**—Defendant was charged by indictment with possession of heroin (Health & Saf. Code, § 11500), possession of a restricted dangerous drug, benzedrine (Health & Saf. Code, § 11910), possession of narcotics paraphernalia (Health & Saf. Code, § 11555), and unlawful possession of a weapon (Pen. Code, § 12020). Pursuant to Penal Code, section 1538.5, subdivision (i) defendant moved to suppress as evidence against him "contraband seized from Apartment #173" at the Casa Cordova Apartments in Anaheim on September 30, 1970. The motion was denied, and, pursuant to a plea bargain, defendant pleaded guilty to possession of restricted dangerous drugs (benzedrine) and the additional counts in the indictment were dismissed. Defendant appeals from the judgment (order granting probation) asserting invalidity of the search warrant pursuant to which the

incriminating evidence was seized. (Pen. Code, § 1538.5, subd. (m).) He also contends he was criminally accused merely because he was associating with persons suspected of illegal activity.

The only legally cognizable issue raised by the latter contention is the sufficiency of the evidence.[1] ■ Defendant is foreclosed from challenging the sufficiency of the evidence by his guilty plea. A plea of guilty amounts to an admission of every element of the crime charged. (*People* v. *Jones,* 52 Cal.2d 636, 651 [343 P.2d 577]; *People* v. *Sanchez,* 24 Cal. App.3d 664, 693-694 [101 Cal.Rptr. 193]; *People* v. *Warburton,* 7 Cal. App.3d 815, 821-822 [86 Cal.Rptr. 894].) Thus, the only question properly before us is the legality of the search and seizure (Pen. Code, §§ 1237.5, 1538.5, subd. (m)) attacked in the trial court (*People* v. *O'Brien,* 71 Cal.2d 394, 403-404 [78 Cal.Rptr. 202, 79 Cal.Rptr. 313, 455 P.2d 138, 456 P.2d 969]; *People* v. *Wolder,* 4 Cal.App.3d 984, 995-996 [84 Cal.Rptr. 788]; *Thompson* v. *Superior Court,* 262 Cal.App.2d 98, 103 [68 Cal.Rptr. 530]).

## The Facts

The search was effected and the incriminating evidence seized pursuant to a search warrant issued September 30, 1970, authorizing, so far as is here pertinent, a search of apartment 173 of the Casa Cordova Apartment complex at a specified address in Anaheim for heroin, narcotics paraphernalia and personal property tending to establish proof of the persons residing thereat.[2] The warrant issued on the basis of an affidavit made and presented to the magistrate that same day by Detective Winkler of the Anaheim Police Department.

---

[1]This contention is presented by defendant's appointed counsel on appeal at defendant's request. Its thrust is disclosed as follows: "Appellant feels that his only offense was in being physically present in the apartment of acquaintances at a time when a search warrant was executed and incriminating evidence found on the premises."

[2]The warrant also authorized a search of apartment 67 of the same apartment complex as well as the persons of defendant and four other individuals, James Puckett, Marjorie Green, Diane Ito and Wayne Ito. The record does not disclose whether apartment 67 [defendant's apartment] or the persons of the named individuals were searched pursuant to the warrant, nor the specific nature of the contraband discovered and seized in apartment 173. In any event, defendant's motion to suppress in the court below was limited to the contraband seized in the search of apartment 173, and it is the legality of that search and seizure to which we properly address ourselves. (*People* v. *O'Brien, supra,* 71 Cal.2d 394, 403-404; *People* v. *Wolder, supra,* 4 Cal.App.3d 984, 995-996; *Thompson* v. *Superior Court, supra,* 262 Cal.App. 2d 98, 103.)

*The Affidavit*

The substance of the affidavit. is set forth in the following paragraphs, some of which are numbered to facilitate identification and discussion hereinafter.

Detective Winkler was thoroughly trained and experienced in police work relating to the use, identification and packaging of narcotics and dangerous drugs and in the jargon used by persons relating to these activities. He knew the terms "stuff," "piece," "bindle," "whites," "joint," "dime and a half," "coming down," "got burned," and "gram" to be part of the jargon used by persons engaged in the unlawful sale, packaging and use of narcotics and dangerous drugs.

On September 24, 1970, Detective Winkler was informed by a reliable,[3] confidential informant that he had that day gone to a specific address in Anaheim and discussed the purchase of heroin with one Marjorie Green, whom the informant knew "from numerous previous dealings of narcotics and dangerous drugs." Marjorie Green told the informant that "all individuals wanting to purchase heroin were being referred to 'Wayne' in Apartment #173 at the Casa Cordova in Anaheim." Marjorie Green was known to Detective Winkler "by arrest records and photographs of the Anaheim Police Department."

Detective Winkler went to the Casa Cordova Apartments in Anaheim and spoke to Mrs. Gilmore, the manager of the apartment complex. She informed him that Art Buchanan [defendant] had rented room number 67 on September 4, 1970. Detective Winkler knew defendant "to be involved in the sale and use of heroin through numerous arrests with the Anaheim Police Department." Mrs. Gilmore also told Detective Winkler that Wayne and Diane Ito rented apartment 173 on September 20, 1970. Before taking the apartment, they asked to see all vacant apartments on the third floor in the rear of the complex near an exit. Number 173 was such an apartment.

Mrs. Gilmore also informed Detective Winkler that the telephones in the apartments at the Casa Cordova Apartment complex are without dials; that the telephones in the apartments are connected to a switchboard operated by her or one of her employees; and that all incoming and outgoing calls must be placed through the switchboard operator. As set forth in the affidavit, Mrs. Gilmore, while performing her duties as switchboard operator and manager of the apartment complex, overheard several telephone

---

[3]In the affidavit it is averred that on two previous occasions the informant furnished information leading to the issuance of search warrants, seizures of the contraband reported by the informant, arrests and complaints.

conversations and observed various transactions, all occurring on September 23, 1970.

1.  On September 23, 1970, Mrs. Gilmore, as the switchboard operator, connected an incoming call to apartment 173. She overheard an individual in that apartment identify herself as "Diane," and heard a male voice say, "I want to buy some pieces." Diane replied that she "was out and would not have any until Saturday."

2.  Later the same day a male telephoned the Casa Cordova Apartments and asked to be connected to apartment 173. Diane answered the phone and the caller said in a panicky voice that "he had to have some 'stuff'." Diane replied that "she only had a 'bindle' and that 'they' were hurting, too." Diane told the male caller to come to the apartment. The caller said, "I need a dime and a half." Diane replied, "OK."

3.  About five minutes later, Jim Puckett entered the Casa Cordova office and in exchange for a $20 bill asked for a $10 bill and two $5 bills.

4.  When Puckett left the office of the Casa Cordova, Mrs. Gilmore observed him approach Diane Ito and both of them enter apartment 173.

5.  Jim Puckett had previously been identified to Mrs. Gilmore by June Duncan, an employee of the Outreach Council which deals with rehabilitation of heroin addicts.

6.  On September 23, 1970 an interapartment call was connected from apartment 67 to apartment 173. Mrs. Gilmore overheard the caller identify himself as "Art," and ask Diane for "six whites and one joint."

7.  Following the foregoing telephone conversation, defendant left apartment 67 and went to apartment 173 and knocked on the door. Diane opened the door and, after a brief period, closed it, leaving defendant on the outside of the apartment. Moments later Diane reopened the door and handed defendant an article and defendant handed Diane an article in exchange.

8.  At approximately 9:05 p.m. on September 23, 1970, a male individual telephoned and asked to be connected to apartment 67. The person who answered in apartment 67 identified himself as "Art." The caller identified himself as "Williams." Williams asked: "Do you have any stuff?" Art replied: "No, but I might be able to get some. How much do you need?" Williams responded: "There's two of us coming down. I need a dime bag now. I don't want any bad stuff. I got burned on a gram this afternoon."

9.  At approximately 11 p.m. the same night, Diane placed an outside

telephone call from apartment 173 to "Charlie." Diane told Charlie to get a bail bondsman to get "Skip" out of jail so he could go to Mexico with Wayne Ito to get some "stuff."

Attached to and incorporated in the affidavit by reference is a police report dated September 23, 1970 made by Sergeant Floan of the Anaheim Police Department and reviewed by Detective Winkler before making his affidavit on September 30. The police report recites that June Duncan telephoned and stated that Jim Puckett "is a 'smack head' and was recently released from prison and had been under her care at Outreach Council in Santa Ana. On September 23, 1970, Jim PUCKETT left the Outreach Council and was followed by Mrs. DUNCAN to [the Casa Cordova Apartments] where he went to room #67. * * * * A short time later PUCKETT went up to Room #173 where he was observed to make a transaction with the persons in that room and then return to Room #67 where Arthur BUCHANAN is registered. Arthur BUCHANAN is known to be a smack dealer and the manager, Mrs. GILMORE, observed this transaction between PUCKETT and the people in Room #173 and it is her impression that this was a Narcotic transaction."

On September 24, 1970, Detective Winkler conducted a surveillance of apartments 67 and 173 at the Casa Cordova. At 10:05 p.m. he saw Diane leave apartment 173, walk to apartment 67, look around as if to see if anyone was watching, and, then, enter apartment 67. The door to apartment 67 was opened by defendant, and another male was observed to be in apartment 67 at the time Diane entered. Approximately 20 minutes later, Diane left apartment 67 and returned to apartment 173. At 11:45 p.m. Diane left apartment 173 and drove away in a Ford stationwagon bearing California license JJN 511. Detective Winkler then drove to the specified address in Anaheim at which the reliable confidential informant had told him the informant had met with Marjorie Green, and Detective Winkler observed the Ford stationwagon bearing California license JJN 511 parked directly in front of the residence at that address.

On September 29, 1970, Detective Winkler conducted a second stakeout at the Casa Cordova Apartments. At 8:05 p.m. he observed Marjorie Green and a male individual admitted to apartment 173 by Diane. About a minute later Diane left apartment 173, met a male person near the apartment, appeared to enter into a conversation with him for several minutes and then returned to apartment 173 carrying a small package which Detective Winkler had not seen her carrying when she originally left the apartment. At 8:13 p.m. Diane left apartment 173 and walked in the direction of apartment 67. Two minutes later Diane returned to

apartment 173. At 9:02 p.m. defendant walked to apartment 173 and was admitted by Diane. At 9:06 p.m. defendant left apartment 173. He was staggering and fell against the guardrail and wall and "appeared to be under the influence of some unknown depressant."

## Evidence at the Suppression Hearing

At the suppression hearing, the defense called several witnesses to testify including Mrs. Gilmore, the manager of the Casa Cordova Apartment complex. In the interrogation of Mrs. Gilmore, testimony was adduced as to a number of facts which, had they been included in Detective Winkler's affidavit, would have tended to support the issuance of the warrant.[4] Mrs. Gilmore testified, however, that a number of the telephone conversations averred in Detective Winkler's affidavit to have been overheard by her and a number of the transactions averred in the affidavit to have been seen by her were not in fact heard or seen by her personally, but were heard and seen by an employee of hers, Mrs. Ullibarri.[5]

Of the incriminating telephone conversations to and from apartment 173 and room 67 reportedly overheard by Mrs. Gilmore in the affidavit, she actually personally heard only those set forth in paragraphs numbered 1 and 9, *ante.* Mrs. Gilmore described in great detail the operation of the switchboard, including the necessity, when connecting a call, for the operator to listen in momentarily to ensure that the recipient answers and that a proper connection has been achieved. She testified that she had not intentionally listened in on the conversation set forth in paragraph numbered 1, *ante,* but that she had inadvertently overheard that conversation. She testified that immediately after overhearing that conversation she telephoned the police and reported what she had heard. She admitted that,

---

[4]Among other things, Mrs. Gilmore testified that June Duncan had informed her that Jim Puckett had "crashed" again, which she understood to mean that he was previously addicted to the use of drugs, had stopped using, but had now resumed using; that after Diane and Wayne Ito moved into apartment 173 there were innumerable telephone calls of short duration placed to the apartment and a remarkable number of visitors who stayed for remarkably short periods of time; and that Mrs. Gilmore had had previous experience with illicit drug traffic by occupants of the apartment complex.

[5]Mrs. Gilmore's testimony was somewhat unsatisfactory and confusing in one respect. She had an obvious tendency to report as her personal knowledge that which she had not observed but which had been related to her by Mrs. Ullibarri or others. It was only under the most precise questioning by defense counsel that it became relatively clear which matters she had heard or seen and which matters were seen by Mrs. Ullibarri and reported to her. We have little doubt that it is this tendency on the part of Mrs. Gilmore that was responsible for Detective Winkler's impression, as stated in his affidavit, that all of the matters were observed and heard personally by Mrs. Gilmore.

thereafter, she intentionally listened in and heard the telephone conversation described in paragraph numbered 9, *ante,* but she denied that she did so at the suggestion or instruction of the police. Rather, she testified that she did so to protect the integrity of the apartment house complex of which she was the manager. The telephone conversations detailed in paragraphs numbered 2, 6 and 8, *ante,* were overheard by Mrs. Ullibarri and reported by her to Mrs. Gilmore. Similarly, Mrs. Gilmore did not personally observe the transaction described in paragraph numbered 7, *ante.* It was observed by someone else, inferentially Mrs. Ullibarri, who related it to her.

The testimony of Mrs. Gilmore also conflicted, at least in part, with the averments of the affidavit set forth in paragraphs numbered 3 and 4, *ante,* and served to clarify the ambiguous statement contained in Sergeant Floan's report as to who it was that observed Jim Puckett go to apartment 173 and there engage in some transaction. Mrs. Gilmore first saw Jim Puckett coming out of apartment 67. She saw him go to the office and later leave the office. She was not present when he asked that the $20 bill be changed. When he left the office, Mrs. Gilmore observed Puckett call to Diane who "was walking along the deck" and run back in her direction, but she did not see the two of them enter apartment 173 nor did she personally observe any exchange transaction between Puckett and the occupants of that apartment. Mrs. Ullibarri was apparently the person Puckett asked to change the $20 bill and who saw Puckett and Diane enter room 173.

### Contentions and Issues

Speaking somewhat generally for the moment, defendant contends that, as a result of the evidence adduced at the suppression hearing contradicting material averments of the affidavit, the entire affidavit in support of the search warrant is invalidated. Failing that, defendant contends that all of the averments concerning the overheard telephone conversations must be disregarded for a variety of reasons; that all matters reportedly observed by Mrs. Gilmore but not actually observed by her personally must be disregarded; that Detective Winkler's personal observations must be disregarded as evidence derived from the unlawful overhearing of the telephone conversations; and that the remaining information contained in the affidavit is insufficient under *Aguilar* v. *Texas,* 378 U.S. 108 [12 L.Ed.2d 723, 84 S.Ct. 1509] to constitute probable cause for issuance of the warrant. The People contend to the contrary in each instance. As the ensuing text and footnotes will indicate, these contentions present a large number of interesting and difficult questions, many of them apparently heretofore undecided. Happily, or unhappily, depending upon one's point of view, we do not find

it necessary to resolve many of the more difficult questions inasmuch as we have concluded that many of the challenged averments of the affidavit may be disregarded and, yet, those remaining are still sufficient to constitute probable cause for issuance of the warrant.

### Integrity of the Affidavit

Citing *United States* v. *Roth,* 391 F.2d 507, defendant contends that the showing at the suppression hearing that material averments in the affidavit were incorrect destroyed the integrity of the entire affidavit, rendering it insufficient as a matter of law to support issuance of the search warrant. Although not fully developed in his brief, it is the position of the Attorney General that the evidence adduced at the suppression hearing not only does not destroy the integrity of the affidavit but, to the extent that additional facts were developed which would have supported the issuance of the warrant had they been included in the affidavit, such evidence may be utilized to support issuance of the warrant.[6]

---

[6]The Attorney General does not go so far as to argue that the facts favorable to the prosecution enumerated in footnote 4, *ante,* may be thus employed. He does argue, however, that the telephone conversations overheard and the observations made by Mrs. Ullibarri, inaccurately reported in the affidavit as being heard and seen by Mrs. Gilmore, may be utilized. Had it been set forth in the affidavit that Mrs. Ullibarri had personally observed these events and overheard these conversations and had reported them to her employer Mrs. Gilmore in the course of her duties pertaining to management of the apartment complex, we have little doubt, aside from the illegal wiretap and eavesdropping problems hereinafter mentioned, that this information could have been considered by the magistrate. What is required is that the affidavit set forth some of the underlying circumstances disclosing the basis upon which the informant made his statement and some of the underlying circumstances from which the officer concluded that the informant was credible or his information reliable, so that the magistrate may judge for himself the persuasiveness of the facts relied on to show probable cause. (*Aguilar* v. *Texas,* supra, 378 U.S. 108, 113-114 [12 L.Ed.2d 723, 727-728, 84 S.Ct. 1509]; *Spinelli* v. *United States,* 393 U.S. 410, 413, 415 [21 L.Ed.2d 637, 641-642, 643, 89 S.Ct. 584]; *United States* v. *Harris,* 403 U.S. 573 [29 L.Ed.2d 723, 91 S.Ct. 2075].) While a number of decisions of the California Supreme Court have used language indicating that to be sufficient to constitute probable cause for the issuance of a warrant in and of itself, an informant's statements must reflect that he spoke with personal knowledge (e.g., *People* v. *Hamilton,* 71 Cal.2d 176, 180 [77 Cal.Rptr. 785, 454 P.2d 681]; *People* v. *Scoma,* 71 Cal.2d 332, 338 [78 Cal.Rptr. 491, 445 P.2d 419]; *Skelton* v. *Superior Court,* 1 Cal.3d 144, 152 [81 Cal.Rptr. 613, 460 P.2d 485]; *Price* v. *Superior Court,* 1 Cal.3d 836, 840 [83 Cal.Rptr. 369, 463 P.2d 721]), the precise question whether hearsay upon hearsay may, under some circumstances, satisfy the requirements of *Aguilar* and *Spinelli* is an open question. (See *Price* v. *Superior Court, supra,* 1 Cal.3d at p. 841.) Had the affidavit accurately set forth the relationship between Mrs. Gilmore and Mrs. Ullibarri, disclosed the fact that Mrs. Ullibarri had personal knowledge of the events and related them to Mrs. Gilmore in the course of her duties relating to management of the apartment complex, we entertain little doubt that the requirements of *Aguilar* would have been fulfilled. In any event, however, even if such averments failed technically to satisfy one or both prongs of the *Aguilar* test, the

Defendant's contention assumes that the defendant in a criminal case is permitted to attack the validity of a search based upon a warrant issued pursuant to an affidavit legally sufficient on its face by means of a subsequent evidentiary hearing in which he attempts to show the averments in the affidavit were untrue or incorrect. This question has not yet been decided in California,[7] and we do not undertake to decide it in this case. Without objection, defendant was permitted to engage in this procedure in the court below, and, for purpose of this decision, we shall assume, without deciding, the propriety thereof. (See *Lockridge* v. *Superior Court*, 275 Cal.App.2d 612, 622 [80 Cal.Rptr. 223].)

The overall problem presented by the contentions of the parties under this head, (see fn. 6, *ante*, and accompanying text) is, assuming the propriety of attempting to impeach the averments of the affidavit at the suppression hearing, the use to which the evidence at the suppression hearing may be put. May it be used only to impeach the averments of the affidavit, or if additional or supplementary facts are developed, may such be used in support of the issuance of the warrant?[8] Having concluded, as will hereinafter appear, that the affidavit in the case at bench is sufficient even if the favorable facts developed at the suppression hearing are disregarded, we do not reach the overall problem. We are required to decide, however, the narrower question whether the testimony of Mrs. Gilmore that she did not personally overhear or see several of the telephone conversations and

magistrate would not have been required to disregard the information entirely. (*People* v. *Superior Court* [*Johnson*], 6 Cal.3d 704, 711-712 [100 Cal.Rptr. 319, 493 P.2d 1183]; *People* v. *Benjamin*, 71 Cal.2d 296, 301-303 [78 Cal.Rptr. 510, 455 P.2d 438]; *People* v. *Scott*, 259 Cal.App.2d 268, 278-279 [66 Cal.Rptr. 257]; cf. *United States* v. *Harris, supra*, 403 U.S. at pp. 580-582 [29 L.Ed.2d at pp. 732-733].) However, inasmuch as we conclude that the affidavit is sufficient even if the telephone conversations overheard and the incidents observed by Mrs. Ullibarri are disregarded, we do not decide these questions.

[7] In *Theodor* v. *Superior Court* (Cal.App.) 98 Cal.Rptr. 486, this court held such a procedure was not statutorily authorized and not constitutionally compelled, at least where there was no claim of perjury in the affidavit. However, the California Supreme Court granted a hearing in *Theodor* February 3, 1972, and decision has not yet been rendered.■ The United States Supreme Court has noted but not decided the question. (*Rugendorf* v. *United States*, 376 U.S. 528, 531-532 [11 L.Ed.2d 887, 891, 84 S.Ct. 825].) For a discussion of the problem and the conflicting authorities in other jurisdictions, see Kipperman, *Inaccurate Search Warrant Affidavits as a Ground for Suppressing Evidence*, 84 Harvard Law Review 825; Note, *Testing the Factual Basis for a Search Warrant*, 67 Columbia Law Review 1529.

[8] In *United States* v. *Roth, supra*, 391 F.2d at page 509, in what we interpret as dicta at least in part, the court, without citation of authority, stated: "What is subsequently adduced at a hearing on a motion to suppress . . . cannot be used by the trial court to augment an otherwise defective affidavit. But if the hearing discloses matters which discredit or impeach the assertions in the affidavit, these must be considered by the trial court in determining whether probable cause in fact existed."

incidents averred to have been overheard and seen by her in the affidavit destroyed the integrity of the affidavit to the extent that it must be held as a matter of law insufficient to support issuance of the warrant. We decide it did not.

The evidence at the suppression hearing did not show that the substance of the reported telephone conversations or incidents was incorrect or untrue. It disclosed only that, as to a number of the telephone conversations and incidents, Mrs. Gilmore was not a percipient witness thereto, but in fact obtained the information from her employee Mrs. Ullibarri. Thus, the evidence showed that the affidavit was incorrect only to the extent it attributed these observations to Mrs. Gilmore. Mrs. Gilmore was not the affiant, and no intentionally false statement on the part of Detective Winkler was shown or indicated. What is shown is the mistaken impression of Detective Winkler that Mrs. Gilmore personally heard and observed these events, which impression we think may be attributed to the tendency of Mrs. Gilmore, as disclosed in her testimony, to fail to distinguish between events personally observed by her and events related to her by others. (See fn. 5, *ante.*)

In *Rugendorf* v. *United States,* 376 U.S. 528, 531-532 [11 L.Ed.2d 887, 891, 84 S.Ct. 825], the Supreme Court, while expressly reserving to future decision the question of the propriety of an attack on the validity of a search by a subsequent impeachment of the affidavit's averments, assumed for the purposes of that decision the propriety of such an attack and ruled on the effect of the factual inaccuracies there shown. The court stated: "The factual inaccuracies depended upon by petitioner to destroy the probable cause . . . were of only peripheral relevancy to the showing of probable cause, and, *not being within the personal knowledge of the affiant, did not go to the integrity of the affidavit.*" (Italics supplied.) ■ We read the italicized portion of the statement to mean that, at least in the absence of a misstatement of fact within the personal knowledge of the affiant, an inaccurate or incorrect averment in the affidavit does not destroy its integrity. (Cf. Kipperman, *supra,* 84 Harv.L.Rev. at pp. 830-833.) Whether Mrs. Gilmore personally overheard and observed the telephone conversations and incidents reported in the affidavit were not facts within the personal knowledge of Detective Winkler. They were facts within the personal knowledge of Mrs. Gilmore, but she was not the affiant.

At least in the absence of misstatements of fact within the personal knowledge of the affiant, the approach taken by the high court in *Rugendorf* was to excise the inaccurate or incorrect information and consider the sufficiency of the remaining information in the affidavit. That was likewise

the technique employed by the court in *Lockridge* v. *Superior Court, supra,* 275 Cal.App.2d at page 622, the only California case of which we are aware bearing on the point. Close analysis reveals that even in *United States* v. *Roth, supra,* 391 F.2d 507, the case relied upon by defendant, the same approach was, in fact, utilized. There, the affiant had, by his own testimony, incorrectly set forth the information supplied him by an informant. Referring to the inaccuracy as a "fatal flaw in the affidavit," the court stated: "When Morrison's testimony is compared with his statement in the affidavit, a contradiction is disclosed, glaring enough to require the trial court to find the affidavit insufficient as a matter of law. [Fn. omitted.]" (391 F.2d at p. 509.) Nevertheless, the court went on to consider the remaining information in the affidavit and found it insufficient. (391 F.2d at pp. 509-511.)[9]

■ If the affidavit impeachment procedure is to be permitted at all, we hold that, at least in the absence of material misstatements of fact within the personal knowledge of the affiant, the correct technique is to excise the inaccurate or incorrect information in the affidavit and to consider the sufficiency of the remaining information in the affidavit. (*Rugendorf* v. *United States, supra,* 376 U.S. at p. 532 [11 L.Ed.2d at p. 891]; *Lockridge* v. *Superior Court, supra,* 275 Cal.App.2d at p. 622; see Kipperman, *supra,* 84 Harv.L.Rev. at pp. 830-833.) Accordingly, for purposes of this decision, we excise and disregard those portions of the affidavit referring to the conversations and events overheard and observed by Mrs. Ullibarri and not by Mrs. Gilmore personally.[10]

### Invasion of Privacy, Unlawful Wiretap or Eavesdropping

Defendant's contention that the telephone conversations personally overheard by Mrs. Gilmore, detailed in paragraphs numbered 1 and 9, *ante,* cannot be considered because they constituted an unlawful invasion of privacy in violation of the Fourth Amendment to the United States Constitution is without merit. ■ "The conduct of a person not acting under authority of a state is not proscribed by the Fourth or Fourteenth Amendments of the Federal Constitution. There are no state standards for 'search

---

[9]We further note that the disposition in *Roth* was not a reversal with directions to dismiss but a reversal and remand for new trial. (391 F.2d at p. 512.)

[10]We note some uncertainty in the propriety of our so doing even under the rule announced. As previously noted, the substance of the telephone conversations overheard and the events observed by Mrs. Ullibarri were not inaccurately or incorrectly reported in the affidavit. The only inaccuracy was the indication in the affidavit that Mrs. Gilmore had personally observed and overheard these events. (See fn. 6, *ante,* and accompanying text.)

and seizure' by a private citizen who is not acting as an agent of the state or other governmental unit." (*People* v. *Superior Court,* 70 Cal.2d 123, 128-129 [74 Cal.Rptr. 294, 449 P.2d 230]; accord: *Stapleton* v. *Superior Court,* 70 Cal.2d 97, 100-103 [73 Cal.Rptr. 575, 447 P.2d 967]; *People* v. *Superior Court,* 11 Cal.App.3d 887, 891 [90 Cal.Rptr. 123].) There was no indication in Detective Winkler's affidavit that Mrs. Gilmore was acting in collaboration with the police or as a police agent. Although defense counsel made considerable effort at the suppression hearing to prove that Mrs. Gilmore was an agent of the police and acting under their instructions in listening in on the overheard telephone conversations, the trial court expressly indicated its determination that such were not the facts, and this determination is amply supported by the evidence. The first telephone conversation (paragraph numbered 1, *ante*) was overheard by Mrs. Gilmore prior to the time she first communicated with the police concerning this case. The second (paragraph numbered 9, *ante*) was overheard by her after she telephoned the police, but, apparently prior to the time she was interviewed by Detective Winkler, and Mrs. Gilmore testified that she listened in on the second conversation not at the suggestion or upon the instructions of the police but for the purpose of protecting the apartment house complex of which she was the manager.

Defendant next contends that Mrs. Gilmore's overhearing these telephone conversations constituted illegal eavesdropping or wiretapping under the California Invasion of Privacy Act (Pen. Code, § 630 et seq.) and title III of the Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. §§ 2510-2520).[11]  ▮  The Attorney General contends that neither the state nor federal acts are applicable to the facts of this case. He makes a number of interesting and provocative arguments involving detailed interpretation of the provisions of the statutes, but we have concluded that his argument that both acts proscribe only intentional, as opposed to inadvertent, overhearing or intercepting of communications is sound and is sufficient to dispose of the case at bench.[12]

---

[11]Defendant, of course, also directs these contentions against the telephone conversations overheard by Mrs. Ullibarri, but, since we have eleminated those telephone conversations from consideration, there is no need to deal with them further except to the extent they incidently affect one subsequent issue (*infra*).

[12]The federal statute was not argued in the court below, nor is it mentioned in the briefs on appeal. Upon prior notice and at our request, however, the parties addressed themselves to the applicability of the federal statute at oral argument. Feeling that decision might turn on one or more of the arguments involving interpretation of some of the more intricate provisions of the federal statute, we made an order authorizing the filing of supplemental letter briefs addressed to the federal statute, its interpretation and legislative history. Upon concluding that the only question necessary to decision is whether the acts proscribe only intentional interception or overhearing, we vacated the order authorizing supplemental briefs.

Some of the more intriguing arguments advanced by the Attorney General may

The continued vitality of those portions of the California Invasion of Privacy Act arguably applicable to the case at bench is exceedingly doubtful in view of the decision in *Halpin* v. *Superior Court,* 6 Cal.3d 885, 896-900 [101 Cal.Rptr. 375, 495 P.2d 1295] in which it was held that title III of the Omnibus Crime Control and Safe Streets Act of 1968 constituted a federal preemption of "particular fields of wiretapping and electronic surveillance." In any event, the prohibitory sections of the state act expressly apply only to intentional wiretapping and eavesdropping. (Pen. Code, §§ 631, subd. (a), 632, subd. (a).) Similarly, the pertinent prohibitory section of the federal act expressly proscribes only willful interceptions (18 U.S.C. § 2511), and the legislative history makes it clear that the word "willfully" was meant to refer only to intentional, as opposed to inadvertent, interception. (See Senate Report (Judiciary Committee) No. 1097 (Apr. 29, 1968) 1968 U.S. Code Cong. & Admin. News, vol. 2, p. 2181

---

be summarized as follows. First, the overhearing of a telephone conversation by a switchboard operator operating a switchboard through which it is necessary that the call be placed and which has been furnished by the telephone company is excepted by the express language of both federal and state statutes. Penal Code, sections 631, subdivision (b) and 632, subdivision (e) each provide: "This section shall not apply . . . to the use of any instrument, equipment, facility, or service furnished and used pursuant to the tariffs of . . . a public utility. . . ." The federal act prohibits only wiretapping or eavesdropping through the use of any electronic, mechanical or other device. (18 U.S.C. §§ 2510, subd. (4), 2511.) "[E]lectronic, mechanical, or other device" is defined by the statute to mean "any device or apparatus which can be used to intercept a wire or oral communication *other than*—(a) any telephone or telegraph instrument, equipment or facility . . . furnished to the subscriber or user by a communications common carrier in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business . . . ." (18 U.S.C. § 2510, subd. (5); italics supplied.) Moreover, 18 United States Code section 2511, subdivision (2)(a) provides: "It shall not be unlawful under this chapter . . . for an operator of a switchboard, or an officer, employee, or agent of any communication common carrier, whose facilities are used in the transmission of a wire communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is necessary incident to the rendition of his service or to the protection of the rights of property of the carrier of such communication . . . ."

Next, although California adheres to the "vicarious exclusionary rule" (*Kaplan* v. *Superior Court,* 6 Cal.3d 150 [98 Cal.Rptr. 649, 491 P.2d 1]), it is probable that the state law, insofar as it relates to this case, has been preempted by the federal act (see *Halpin* v. *Superior Court, infra,* 6 Cal.3d 885, 896-900), and the federal act, while providing for the exclusion of evidence obtained in violation of its provisions (18 U.S.C. § 2515), also provides that only an "aggrieved person" may assert the exclusionary rule. (18 U.S.C. § 2518, subd. (10); see Senate Report No. 1097 (Apr. 29, 1968) 1968 U.S. Code Cong. & Admin. News, vol. 2, pp. 2179-2180, 2195.) 18 United States Code section 2510, subdivision (11) provides: " '[A]ggrieved person' means a person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed." Defendant was not a party to the telephone conversations set forth in paragraphs numbered 1 and 9, *ante,* and it is suggested that, at least with respect to the first telephone conversation, the interception was not *directed at him* or, indeed, anyone inasmuch as it was inadvertent.

[citing *United States* v. *Murdock,* 290 U.S. 389, 394-395 (78 L.Ed. 381, 384-385, 54 S.Ct. 223)].)

Detective Winkler's affidavit did not indicate whether the telephone conversations had been overheard intentionally or inadvertently. In the absence of a contrary showing, for the purpose of assessing the existence of probable cause, we think the magistrate was entitled to presume that Mrs. Gilmore was not guilty of a crime or wrongdoing. (Cf. Evid. Code, § 520.) At the suppression hearing, as previously indicated, Mrs. Gilmore described in great detail the operation of the switchboard and testified that she overheard the first conversation (paragraph numbered 1, *ante*) inadvertently rather than intentionally. That this was the fact accepted by the trial court is established by his ruling denying the motion to suppress as well as his comments at the suppression hearing. His determination being supported by substantial evidence, it is established for purposes of this appeal that Mrs. Gilmore's overhearing the first conversation was inadvertent and, thus, not violative of either the state or federal statutes.

On the other hand, Mrs. Gilmore admitted that she intentionally listened in on the telephone conversation detailed in paragraph numbered 9, *ante.* Inasmuch as we have concluded that the affidavit is sufficient even if its reference to this conversation is also disregarded, it is unnecessary for us actually to decide whether that conversation was overheard unlawfully. For purposes of this decision, we shall assume, without deciding, that it was.[13]

The foregoing assumption, while making unnecessary the resolution of a number of issues (see fn. 12, *ante*), raises another question however. ▮ What is the effect of a police officer's including in an affidavit for a search warrant information received from a private citizen informant obtained by the informant by an unlawful wiretap or eavesdropping? Does it invalidate the entire affidavit, or is it necessary only to excise and disregard the information unlawfully obtained and any other information obtained as the tainted "fruit" thereof? We hold the latter alternative to be the appropriate one. To hold otherwise would impose upon society's legitimate right to and need for prosecution and conviction of law violators an unconscionable burden without corresponding benefit related to the

---

[13]This assumption would also apply to the telephone conversations overheard by Mrs. Ullibarri were we otherwise considering them. (See fn. 11, *ante.*) Although Mrs. Ullibarri did not testify at the suppression hearing, the conclusion is irresistable that she intentionally listened in on one or more of the telephone conversations she overheard. Of course, were we actually deciding whether her doing so was unlawful, we should have to decide the questions presented by the Attorney General's other arguments as set forth in footnote 12, *ante.*

objective of the exclusionary rule of deterring illegal police conduct. In reference to the exclusionary rule, Justice Cardozo in his famous opinion in *People* v. *Defore,* 242 N.Y. 13 [150 N.E. 585, 588] accurately noted: "The pettiest peace officer would have it in his power, through overzeal or indiscretion, to confer immunity upon an offender for crimes the most flagitious." To hold that the inclusion in an affidavit for search warrant of information given by a private citizen obtained by him by unlawful wiretapping or eavesdropping invalidates the entire affidavit notwithstanding other indepedent information in the affidavit sufficient to justify issuance of a warrant, would extend the power to confer immunity upon a private citizen. Such a result is inadvisable and unwarranted. The violation of the federal or state acts by a private citizen is a crime which would subject the private citizen to criminal penalties. He would no doubt also be liable for damages in a civil suit for invasion of privacy. In addition, both the federal act (18 U.S.C. § 2515) and the California act (Pen. Code, §§ 631, subd. (c), 632, subd. (d)) prohibit the introduction of such unlawfully obtained evidence at trial. These remedies are ample to effectuate the purposes of the statutes insofar as the conduct of private citizens is concerned.

### Sufficiency of Remaining Affidavit

■ Having excised from the affidavit all of the information set forth in paragraphs numbered 2 through 9, *ante,* except for those portions of the incidents set forth in paragraphs numbered 3 and 4, *ante,* personally observed by Mrs. Gilmore, we come at last to the question of the sufficiency of the remaining information in the affidavit to support issuance of the warrant. It is to be remembered that on this appeal we are concerned with the warrant only insofar as it authorized a search of apartment 173, the apartment of Diane and Wayne Ito. (See fn. 2, *ante.*)

Although it was not first in time, we turn first to the information supplied by Mrs. Gilmore. In the first place, we observe that Mrs. Gilmore, as manager of the apartment house, who made personal observations indicating criminal conduct, qualifies as an identified citizen informant whose information may generally be relied upon. (*People* v. *Lopez,* 271 Cal.App.2d 754, 759-760 [77 Cal.Rptr. 59]; *People* v. *Guidry,* 262 Cal.App.2d 495, 497-498 [68 Cal.Rptr. 794]; *People* v. *Lewis,* 240 Cal. App.2d 546, 549-551 [49 Cal.Rptr. 579]; see also *Horack* v. *Superior Court,* 3 Cal.3d 720, 726-727, 731 [91 Cal.Rptr. 569, 478 P.2d 1]; cf. *People* v. *Scoma,* 71 Cal.2d 332, 338, fn. 7 [78 Cal.Rptr. 491, 455 P.2d 419] and accompanying text.) Mrs. Gilmore informed Detective Winkler that Diane and Wayne Ito had rented apartment 173 on September 20

after asking to see all vacant apartments on the third floor in the rear of the complex near an exit and that apartment 173 was so situated. Three days later, in connecting an incoming telephone call to apartment 173, she overheard an individual in that apartment identify herself as "Diane," and heard a male voice say, "I want to buy some pieces," and heard Diane reply that she "was out and would not have any until Saturday." Given the fact that the words "piece" or "pieces" are part of the jargon used by persons engaged in illicit drug traffic, this information alone may have been sufficient to support a reasonable and conscientious strong suspicion that the occupants of apartment 173 were engaged in illicit narcotics traffic and that contraband would be present there on and after September 26, 1970.

But the existence of probable cause need not be founded on this information alone. The affidavit also sets forth that Detective Winkler was informed by a reliable confidential informant that on September 24, 1970 he had gone to a specified address in Anaheim and discussed the purchase of heroin with Marjorie Green, whom the informant knew "from numerous previous dealings of narcotics and dangerous drugs," and that Marjorie Green had told the informant that "all individuals wanting to purchase heroin were being referred to 'Wayne' in Apartment #173 at the Casa Cordova in Anaheim." Defendant is correct in characterizing this information as hearsay upon hearsay. It is also probably correct that, as they relate to Marjorie Green and the information emanating from her, these averments in the affidavit fail to satisfy either prong of the *Aguilar* test. (See fn. 6, *ante.*) This information, therefore, could not in and of itself justify issuance of the warrant. (*Price* v. *Superior Court,* 1 Cal.3d 836, 841 [83 Cal.Rptr. 369, 463 P.2d 721].) However, the magistrate was still entitled to consider the information. (*People* v. *Superior Court [Johnson],* 6 Cal.3d 704, 711-712 [100 Cal.Rptr. 319, 493 P.2d 1183]; *People* v. *Benjamin,* 71 Cal.2d 296, 301-303 [78 Cal.Rptr. 510, 455 P.2d 438]; *People* v. *Scott,* 259 Cal.App.2d 268, 278-279 [66 Cal.Rptr. 257]; cf. *United States* v. *Harris,* 403 U.S. 573, 580-582 [29 L.Ed.2d 723, 732-733, 91 S.Ct. 2075].) The information indicated that the confidential informant had had previous dealings with Marjorie Green in illicit drug traffic; that he went to see her on September 24 to discuss the purchase of heroin and was referred by her to "Wayne" at apartment 173 at the Casa Cordova Apartments. This would tend to corroborate and give color and substance to the telephone conversation overheard and reported by Mrs. Gilmore, and we have little doubt that, taken together, the information supplied by Mrs. Gilmore and that supplied by the reliable confidential informant were sufficient to support a finding of probable cause. (Compare the infor-

mation disclosed in the affidavit held sufficient in *People* v. *Sanchez, supra,* 24 Cal.App.3d 664, 674-675.)

Having so concluded, we might well terminate this already lengthy opinion, but there was yet other pertinent information contained in the affidavit that the magistrate was entitled to consider. Sergeant Floan's report stated that June Duncan had telephoned and stated that Jim Puckett was a "smack head" recently released from prison and under her care at the Outreach Council [dealing with the rehabilitation of narcotics addicts] and that on September 23, 1970, Mrs. Duncan saw him go to the Casa Cordova Apartments. Eliminating what Mrs. Gilmore did not personally see, she did observe him approach Diane Ito at the Casa Cordova Apartments on September 23, 1970.

Additionally, the affidavit sets forth the personal observations of Detective Winkler. He had been informed that defendant had rented room 67 on September 4, 1970 and he knew defendant "to be involved in the sale and use of heroin through numerous arrests with the Anaheim Police Department." ▉ Although previous arrests of a suspect in connection with illicit drug transactions will certainly not suffice to constitute probable cause for search or arrest, and while, indeed, arrests without convictions may be of little probative value, still a suspect's reputation as being involved in illicit drug traffic based on prior arrests may be considered. (*United States* v. *Harris, supra,* 403 U.S. 573, 582-583 [29 L.Ed.2d 723, 733, 91 S.Ct. 2075]; *Brinegar* v. *United States,* 338 U.S. 160, 172-174 [93 L.Ed. 1879, 1888, 1889, 69 S.Ct. 1302]; *People* v. *Morales,* 259 Cal.App.2d 290, 295 [66 Cal.Rptr. 234]; cf. *People* v. *Torres,* 56 Cal.2d 864 [17 Cal.Rptr. 495, 366 P.2d 823].) ▉ We may ignore what Detective Winkler saw during his stakeout on September 24, 1970. His observations on September 29, 1970, however, are more meaningful. It may be true that in some other context, the events observed by Detective Winkler on that night might be interpreted as innocent activity, but in light of the allowable information from Mrs. Gilmore, the information from the reliable confidential informant and the officer's knowledge of defendant's reputation for being involved in the sale and use of heroin, Marjorie Green's presence in apartment 173 and defendant's entry into that apartment and his exit therefrom some four minutes later at which time he was staggering, fell against the guardrail and wall and "appeared to be under the influence of some unknown depressant," were certainly corroborative of the other information indicating that the occupants of apartment 173 were engaged in illicit narcotics traffic.

Defendant contends that the observations of Detective Winkler should

have been disregarded because they were derived from the assumedly unlawful wiretapping or eavesdropping by Mrs. Gilmore or Mrs. Ullibarri. Although, as we have previously indicated, we do not deem the consideration of Detective Winkler's personal observations to be essential to finding the affidavit sufficient, we do not agree that the officer's personal observations constituted tainted fruit of the assumedly unlawful wiretapping or eavesdropping. He would undoubtedly have conducted the surveillances and observed the same things as a result of the information from the reliable confidential informant coupled with the report by Mrs. Gilmore of the first telephone conversation overheard by her. Assuming that the other telephone conversations were unlawfully overheard, the observations of Detective Winkler made during his two surveillances were not tainted fruit thereof. (Cf. *People* v. *McInnis*, 6 Cal.3d 821, 824-826 [100 Cal.Rptr. 618, 494 P.2d.690]; *Lockridge* v. *Superior Court*, 3 Cal.3d 166, 169-171 [89 Cal.Rptr. 731, 474 P.2d 683]; *People* v. *Ditson*, 57 Cal.2d 415, 442-445 [20 Cal.Rptr. 165, 369 P.2d 714].)

## Conclusion

In concluding, we cannot help but comment that the very existence of this appeal and the nature, number and complexity of the issues it has presented, both those decided and undecided, constitute an argument more eloquent than any advocate could present against permitting the defendant in a criminal case, at least in the absence of a claim of perjury on the part of a government agent, to attack the validity of a search conducted pursuant to a warrant valid on its face issued pursuant to an affidavit legally sufficient on its face by a subsequent evidentiary hearing in which he is allowed to attempt to contradict or impeach the averments of the affidavit.

Judgment affirmed. .

Gabbert, Acting P. J., and Tamura, J., concurred.